AAA DISPOSAL SYSTEMS, INC., *et al.*, Plaintiffs-Appellants and Cross-Appellees, v. AETNA CASUALTY AND SURETY COMPANY *et al.*, Defendants-Appellees (BFI Waste Systems of North America, Inc., *et al.*, Intervenors-Appellants and Cross-Appellees; American Employers' Insurance Company, Defendant-Appellee and Cross-Appellant).

Second District    No. 2—03—0416

Opinion filed January 13, 2005.

Edward M. Maher, of Guyer & Enichen, P.C., of Rockford, for appellants.

James R. Branit and James J. Berdelle, both of Bullaro & Carton, Chtrd., of Chicago, for appellee American Employers' Insurance Company and Commercial Union Insurance Company.

Jan M. Michaels and Steve Schulwolf, both of Michaels & May, P.C., of Chicago, for appellee Continental Casualty Company.

Michael R. Gregg and Donald G. Machalinski, both of Merlo, Kanofsky & Brinkmeier, Ltd., of Chicago, for appellees International Insurance Company and United States Fire Insurance Company.

Thomas B. Keegan and Edward W. Gleason, both of Keegan, Laterza, Lofgren & Gleason, P.C., of Chicago, for appellee National Fire & Marine Insurance Company.

Sharon A. Salinas, of Dykema Gossett Rooks Pitts, P.L.L.C., of Chicago, and William G. Beck, Alok Ahuja, and Jeffrey M. Russell, of Lathrop & Gage, L.C., of Kansas City, Missouri, and Gary D. Justis, of Lathrop & Gage, of Overland Park, Kansas, for other appellees.

JUSTICE McLAREN delivered the opinion of the court:

Plaintiffs and intervenors appeal the trial court's order determining that plaintiffs' claims were not covered under the policies at issue and granting summary judgment in favor of defendants. We affirm this order.

Intervenors appeal, and defendant American Employers' Insurance Company cross-appeals, the trial court's order regarding the allocation of liability. We reverse this order.

As a preliminary matter, we grant intervenors' unopposed motion to file corrected briefs.

The following facts are taken from the record. Plaintiffs in this suit are AAA Disposal Systems (AAA), M.I.G. Investments (MIG), and Jack and Richard Ter Maat. AAA was a cartage company that hauled waste to a landfill; MIG operated the landfill. The now-deceased Jack Ter Maat was a principal shareholder of both AAA and MIG and vice president of MIG. Richard Ter Maat was the president and a principal shareholder of both AAA and MIG.

Intervenors, BFI Waste Systems of North America, Inc., Apache Products Company, Tamms Industries, Daimler Chrysler Corporation, f/k/a Chrysler Corporation, The Ingersoll Milling Machine Company, Amerock Corporation, Camcar Division of Textron, Inc., Twin Disc, Inc., and Wilmar Processing Company are a group of companies that cleaned up the landfill site. Pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9607 et seq. (2000), intervenors obtained a multimillion dollar judgment against plaintiffs for contribution to the cleanup costs of the 47-acre landfill, located near Belvidere, Illinois. The landfill was operated from February 1969 to June 1988, when the State of Illinois obtained an injunction ceasing all dumping operations at the landfill. In June 1988, plaintiffs abandoned the landfill.

Defendants are insurance companies that issued plaintiffs insur-

ance policies effective from October 1973 through May 1988. Commercial Union Insurance Company issued three one-year primary general liability policies to plaintiffs between 1973 and 1976, with per-occurrence liability limits of $100,000. Continental Casualty Company issued six primary general liability policies to plaintiffs between 1979 and 1985, with per-occurrence liability limits of $500,000. American Employers' issued three excess policies to plaintiffs MIG and AAA between September 1973 and October 1976. The first two policies had per-occurrence liability limits of $1 million, but the third policy's per-occurrence liability limit was $5 million.

In 1985, the State of Illinois filed a complaint against plaintiffs, alleging, *inter alia*, that the landfill was contaminating the waters of Illinois by runoff and seepage of contaminates. In September 1988, plaintiffs sold the landfill site to Waste Management of Wisconsin. In August 1990, the United States Environmental Protection Agency (USEPA) placed the landfill on the Superfund national priorities list.

On October 29, 1990, the USEPA and BFI entered into an administrative order on consent requiring interim remedial measures (IRMs). In May 1989, June 1990, April 1993, and July 1993, as part of the IRMs, thousands of gallons of leachate were removed from the landfill's leachate lagoon. In addition, in November 1990, the leachate lagoon berms were raised. From 1991 to 1993, intervenors conducted IRMs at the landfill pursuant to the administrative order on consent. These IRMs included tasks that were necessary to properly close the landfill.

The first notification to any insurer of problems with the landfill site was on January 6, 1991. In late 1991, intervenor/BFI initiated a CERCLA cause of action seeking money damages from plaintiffs for past and future costs incurred in response to environmental contamination of the landfill site.

In 1992, intervenors obtained a judgment against plaintiffs for *contribution to the cost of the IRMs through December 1997*. Plaintiffs were held responsible for 85% of the cost of emergency measures, IRMs, and supplemental emergency removals, for a total of $2,349,116.95. Plaintiffs were also liable for 27.14% of the costs not related to the IRMs, for a total of $1,795,318.20.

In December 1993, plaintiffs filed a declaratory action against defendants/insurers, seeking a declaration that defendants/insurers must indemnify plaintiffs under the terms of their policies. In 1998, the trial court granted intervenors leave to intervene.

On December 22, 1998, the trial court granted summary judgment in favor of all defendants/insurers based on plaintiffs' failure to give timely notice of an occurrence. After reconsidering its grant of sum-

mary judgment, the trial court again ruled in favor of all defendants except for the insurers that also provided excess coverage, including American Employers'. With respect to defendants Continental Casualty and Commercial Union, the trial court reasoned that, although they had not initially defended plaintiffs in the underlying CERCLA action, they were not estopped from asserting a late-notice defense. The court based this ruling in part on an "interim defense agreement" entered into in 1995 among plaintiffs, Continental Casualty, and Commercial Union, providing that plaintiffs would not assert claims of estoppel or waiver against these insurers based on their alleged failure or wrongful refusal to defend plaintiffs in the CERCLA action. The trial court rejected intervenors' arguments that the agreement was not supported by consideration and that intervenors had vested rights that could not be diminished by the "interim defense agreement."

Subsequently, plaintiffs and intervenors settled with all defendants to whom summary judgment had been denied, except American Employers'. After a bench trial, the court found American Employers' liable for its *pro rata* share of the judgment entered against plaintiffs after exhaustion of primary policies and any future liability. This appeal followed.

We first address the motions to dismiss this appeal, filed by defendants Commercial Union and Continental Casualty. These defendants argue that this appeal should be dismissed because the intervenors and plaintiffs filed late notices of appeal as to these defendants. We disagree with Commercial Union and Continental Casualty and deny the motions to dismiss this appeal.

The relevant facts are as follows. In December 1998, the trial court granted summary judgment in favor of all seven defendants/ insurers, including Commercial Union and Continental Casualty. The December 1998 order included Rule 304(a) (155 Ill. 2d R. 304(a)) language, stating that there was no just reason to delay enforcement or appeal of the order. In August 1999, the trial court granted plaintiffs' and intervenors' motions for reconsideration, modified the December 1998 order, and vacated summary judgment as to four of the seven defendants/insurers, but not as to Commercial Union or Continental Casualty. This August 1999 order did not contain Rule 304(a) language. Plaintiffs and intervenors filed their notices of appeal in April 2003, within 30 days of the final order that is the subject of this appeal. Commercial Union and Continental Casualty assert that the notices of appeal were not timely as to them.

Supreme Court Rule 303(a)(1) states that a notice of appeal must be filed within 30 days of the entry of the final judgment ap-

pealed from or, "if a timely post-trial motion directed against the judgment is filed, *** within 30 days after the entry of the order disposing of the last pending post-judgment motion." 155 Ill. 2d R. 303(a)(1). An order vacating a judgment is not final and consequently not appealable because the merits of the case are still pending. *In re Marriage of Agustsson*, 223 Ill. App. 3d 510, 514 (1992).

■ Supreme Court Rule 304(a) provides that in an action involving multiple parties or multiple claims for relief, an appeal may be taken from a final judgment as to one or more but fewer than all of the parties or claims only if the trial court makes a special finding that there is no just reason for delaying enforcement or appeal. 155 Ill. 2d R. 304(a). "In the absence of such a finding, any judgment that adjudicates *** the rights and liabilities of fewer than all the parties is not enforceable or appealable and is subject to revision at any time before the entry of a judgment adjudicating all the claims, rights, and liabilities of all the parties." 155 Ill. 2d R. 304(a).

■ In this case, the trial court granted summary judgment in favor of all defendants/insurers but then vacated that order as to only four defendants/insurers, not including Commercial Union and Continental Casualty. The vacation order did not reiterate that the final but otherwise nonappealable order granting summary judgment was appealable and enforceable. Because the order vacating the original judgment altered rather than left the prior order intact, it was a new and different order that was not final as to all parties and all claims. To grant the appellate court jurisdiction pursuant to Rule 304(a), an order must contain the requisite Rule 304(a) language to place the parties and the appellate court on notice that jurisdiction has attached and the time to file a notice of appeal from that order is running. However, the order of vacation did not contain Rule 304(a) language. Thus, the trial court refused to grant appellate jurisdiction and retained the power to revise any or all judgments at any time prior to the entry of a judgment adjudicating all claims. See *Petersen Bros. Plastics, Inc. v. Ullo*, 57 Ill. App. 3d 625 (1978). The order vacating the judgment left pending plaintiffs' and intervenors' actions against Commercial Union and Continental Casualty and, therefore, the actions themselves were not terminated. Accordingly, plaintiffs' and intervenors' notices of appeal were timely because they were filed within 30 days of the final modified order.

Commercial Union and Continental Casualty argue that *Petersen* is not applicable here because when *Petersen* was decided, the time to appeal following Rule 304(a) certification was not tolled by a postjudgment motion. We fail to see how the amendment of the rule would affect the holding in *Petersen*. The holding in *Petersen* is still viable. See,

*e.g., Yugoslav-American Cultural Center, Inc. v. Parkway Bank & Trust Co.,* 327 Ill. App. 3d 143 (2001).

Commercial Union and Continental Casualty argue that Rule 304(a) language would not have made the order vacating summary judgment final and appealable as to them. Commercial Union and Continental Casualty argue that adding Rule 304(a) language to an order on a postjudgment motion has no legal effect because such an order is not a judgment disposing of a claim.

Commercial Union and Continental Casualty cite *Sears v. Sears,* 85 Ill. 2d 253 (1981), and *McCorry v. Gooneratne,* 332 Ill. App. 3d 935 (2002), to support their argument. However, unlike the case at bar, in those cases, the trial courts denied the plaintiffs' postjudgment motions. Here, the court granted the motions and vacated its prior order and essentially replaced it with the August 1999 order. Thus, the cases cited above are not applicable here. *Cf. Gibson v. Belvidere National Bank & Trust Co.,* 326 Ill. App. 3d 45, 49 (2001). In *Gibson,* there was a similar alteration and supplanting of the original judgment by a new judgment. The clock was reset. With a new judgment, the appeal process starts anew. However, the new/second judgment in this case did not contain the language necessary to make the order final and appealable.

Commercial Union also argues that plaintiffs' and intervenors' argument regarding late notice is waived for failure to provide a complete record. Although the record lacks certain transcripts and pleadings, the record is sufficient for us to decide the issue.

Addressing the merits of the appeal, plaintiffs argue that the defendants/primary insurers were not entitled to summary judgment based on late notice, because Richard and Jack Ter Maat gave notice to the insurers of a suit as soon as practicable. We disagree with plaintiffs because they fail to recognize that they also had breached the duty to notify the insurers of an occurrence.

The construction of an insurance policy presents a question of law subject to *de novo* review. *State Farm Mutual Automobile Insurance Co. v. Villicana,* 181 Ill. 2d 436, 441 (1998). When construing an insurance policy, we ascertain and give effect to the intention of the parties as expressed in the policy, according to the plain and ordinary meaning of the terms used in the policy. *Villicana,* 181 Ill. 2d at 441. We will apply those terms as written, reading the policy as a whole and considering the type of insurance, the nature of the risks involved, and the overall purpose of the contract. *Villicana,* 181 Ill. 2d at 442. The provisions of the policy are to be construed liberally in favor of the insured and against the insurer. *Villicana,* 181 Ill. 2d at 442.

The primary insurers' policies all required plaintiffs to provide

written notice of an occurrence "as soon as practicable," or "promptly." The policies also required "immediate" and "prompt" notice of a claim or suit.

■ It is well settled that a notice provision is a valid condition precedent to coverage and not a mere technical requirement that an insured may overlook or ignore with impunity. *Montgomery Ward & Co. v. Home Insurance Co.*, 324 Ill. App. 3d 441, 448 (2001). Where the facts are undisputed, the reasonableness of notice to an insurer is a question of law. *Montgomery Ward*, 324 Ill. App. 3d at 448. A delay of even a few months in giving notice has been held to be unreasonable and to constitute a breach of the notice provision of an insurance policy as a matter of law. *Montgomery Ward*, 324 Ill. App. 3d at 449. Such a breach defeats coverage and justifies the entry of summary judgment for the insurance company. *Montgomery Ward*, 324 Ill. App. 3d at 449.

It is undisputed that, by April 1984, plaintiff Richard Ter Maat signed a USEPA inspection report that documented off-site leaching and groundwater contamination at the landfill. In 1985, the State of Illinois filed a complaint against plaintiffs, seeking cleanup of the hazardous landfill. Yet, plaintiffs did not notify the insurers until 1990 or 1991. Plaintiffs' six- or seven-year delay in giving notice to the insurers constitutes late notice of an occurrence under any reasonable interpretation of the policy provisions.

Plaintiffs and intervenors also argue that defendants were not entitled to summary judgment because they failed to show that they had been prejudiced by plaintiffs' delay in giving notice. Defendants/ primary insurers argue that they were not required to show prejudice. We agree with defendants/primary insurers. See *Montgomery Ward*, 324 Ill. App. 3d at 449.

■ Although intervenors and plaintiffs attempt to analogize an insured's duty to provide notice of an occurrence with other obligations of an insured, we are not persuaded. Regarding the issue of prejudice, it is well settled that an insurer does not have to prove that it was prejudiced by an insured's breach of the notice clause in a policy to be relieved of its duty to pay. *Montgomery Ward*, 324 Ill. App. 3d at 449. Lack of prejudice to the insurer is a factor to be considered only where the insured has a good excuse for the late notice or where the delay was relatively brief. *Montgomery Ward*, 324 Ill. App. 3d at 449. In the instant case, plaintiffs did not present a good excuse for the late notice, and their delay was not relatively brief; therefore, prejudice is not a factor to be considered. See *Montgomery Ward*, 324 Ill. App. 3d at 449.

To support their argument that defendants/insurers were required

to show prejudice, intervenors and plaintiffs cite cases that are factually distinguishable from the case at bar. In *Cincinnati Cos. v. West American Insurance Co.*, 183 Ill. 2d 317 (1998), *Household International, Inc. v. Liberty Mutual Insurance Co.*, 321 Ill. App. 3d 859 (2001), *Vega v. Gore*, 313 Ill. App. 3d 632 (2000), *Illinois Founders Insurance Co. v. Barnett*, 304 Ill. App. 3d 602 (1999), and *Rice v. AAA Aerostar, Inc.*, 294 Ill. App. 3d 801 (1998), the insureds provided late notice of a lawsuit. In this case, plaintiffs provided late notice of an occurrence, thereby preventing defendants/insurers from making a timely investigation. The importance of this distinction was noted in *AAA Aerostar*, 294 Ill. App. 3d at 807. Accordingly, the cited cases are not controlling here.

In support of their argument, intervenors and plaintiffs also cite cases regarding an insurer's breach of a cooperation clause (*M.F.A. Mutual Insurance Co. v. Cheek*, 66 Ill. 2d 492 (1977)) and cases regarding nonconsensual settlements (*Mulholland v. State Farm Mutual Automobile Insurance Co.*, 171 Ill. App. 3d 600 (1988); *Marsh v. Prestige Insurance Group*, 58 Ill. App. 3d 894 (1978); *Hoel v. Crum & Forster Insurance Co.*, 51 Ill. App. 3d 624 (1977)). Because these cases do not address an insured's breach of the duty to notify an insurer of an occurrence, the cases are not applicable.

Intervenors and plaintiffs cite numerous cases from our sister states. However, these cases are not binding here and are not persuasive to the extent that they conflict with established Illinois law. See *VanPlew v. Riccio*, 317 Ill. App. 3d 179, 184 (2000).

■ Next, plaintiffs and intervenors argue that defendants/primary insurers are estopped from relying on a late-notice defense because they failed to timely defend plaintiffs. However, the record reveals that plaintiffs waived estoppel when they agreed in an interim defense agreement that they would not "assert any estoppel or waiver against the Insurers based on an alleged failure or wrongful refusal to defend the Policyholders in relation to the Action." It is well settled that parties to an agreement may waive delays in performance by conduct indicating an intention to regard the agreement as still in force and effect. See *Bank of Wheaton v. Village of Itasca*, 178 Ill. App. 3d 626, 632 (1989). Further, judgment creditors have no greater rights than the insured but stand in the shoes of the insured. See *Lynn v. Village of West City*, 36 Ill. App. 3d 561, 562-63 (1976). Accordingly, because estoppel is unavailable to plaintiffs, it is unavailable to intervenors. See *Bourne v. Seal*, 53 Ill. App. 2d 155, 170 (1964).

In addition, intervenors cannot assert an independent right to estoppel, because they have failed to show that they were the intended direct beneficiaries of the policies. A third party may not enforce

rights arising out of a contract between two other contracting parties unless these contracting parties intentionally entered into the contract for the direct benefit of the third party. *Fantino v. Lenders Title & Guaranty Co.*, 303 Ill. App. 3d 204, 207 (1999). The intervenors were not parties to the insurance contracts and have not established that they were arguably the intended direct beneficiaries. Therefore, intervenors cannot assert estoppel. In light of our determination above, we need not discuss intervenors' other arguments regarding estoppel.

■ Plaintiffs assert that Richard and Jack Ter Maat gave notice to the insurers of a suit as soon as practicable. Plaintiffs claim that the Ter Maats had no reason to believe that they would be subject to a claim under CERCLA until they were named as defendants. We disagree to the extent that plaintiffs ignore that they had a duty to notify the insurers of an occurrence as well as of a suit, and they have failed to establish that they were unaware of the occurrence. The record reveals that in 1984 Richard Ter Maat knew that the landfill was leaching into the groundwater and in 1985 he knew that the State of Illinois filed a suit seeking cleanup of the hazardous landfill. Thus, even if Richard Ter Maat did not have reason to believe that he would become liable to the federal government, he knew that there was an "occurrence" under the policies.

■ Regarding Commercial Union, we also note that it had no duty to defend under the first two of its three policies because the first two policies provided coverage before 1975. Since the underlying action sought indemnification for occurrences after 1975, it is uncontroverted that the pre-1975 policies provided no coverage.

■ Next, intervenors argue that the trial court erred by requiring horizontal exhaustion of all primary carriers before recovery could be had from excess insurer defendant/American Employers'. Intervenors assert that American Employers' policies were in force from 1973 through 1976 and that excess coverage should be triggered after exhaustion of the primary coverage in effect in those years only. The American Employers' excess policies listed only certain primary policies. However, the American Employers' excess policies contain "other insurance" provisions. The policies in question provide:

> "If *any other* valid and collectible insurance exists protecting the Insured against ultimate net loss covered by this policy (other than the policies of underlying insurance specified in Item 3 of the Declarations and other than any policy with respect to which this policy is specified therein as underlying insurance), *** *this policy shall apply but only as excess insurance over such other valid and collectible insurance, in an amount not to exceed the limit of the*

company's liability stated in this policy, and not as contributing insurance." (Emphasis added.)

This clause clearly sets forth the American Employers' policies' status as excess coverage. The excess policies clearly set forth that, as an excess insurer, American Employers' will not contribute "if any other valid and collectible insurance exists." Nothing in the applicable clauses limits the other valid and collectible insurance to those policies listed in the declarations. The absence of limiting language supports an interpretation that the American Employers' excess policies serve as excess policies to all triggered primary policies, regardless of whether they extend over multiple policy periods or only one and regardless of whether they are listed in the declarations. See *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598, 653 (1994). We also note that intervenors' interpretation would render the above section meaningless. See *First Bank & Trust Co. of Illinois v. Village of Orland Hills*, 338 Ill. App. 3d 35, 40 (2003) ("A court will not interpret an agreement in a way that would nullify its provisions or render them meaningless"). We note that our holding is in accord with our previous holding in *Missouri Pacific R.R. Co. v. International Insurance Co.*, 288 Ill. App. 3d 69, 84 (1997). After interpreting language similar to that at issue here, we stated as follows: "Missouri Pacific must horizontally exhaust a full [self-insured retention] per occurrence per policy period before it may look to coverage under the policies." *Missouri Pacific R.R. Co.*, 288 Ill. App. 3d at 84. Consequently, we reject intervenors' claim and affirm the trial court's ruling that American Employers' excess policies are triggered only after the primary insurers' coverage is horizontally exhausted.

█ Intervenors also argue that the trial court erred by holding American Employers' liable only after horizontal exhaustion of the primary insurers' coverage and only for its *pro rata* share over the coverage period. Intervenors believe that American Employers' is jointly and severally liable for all sums regardless of when the damages occurred. Intervenors rely on the coverage provisions of the policies, which provide that American Employers' will:

> "[I]ndemnify the insured for *all sums* which the Insured shall be obligated to pay by reason of the liability imposed upon him by law or liability assumed by him under contract or agreement for damages, and expenses, all as included in the definition of 'ultimate new loss,' because of [personal injuries, property damage, and advertising liability.]" (Emphasis added.)

Intervenors' argument ignores the plain and ordinary meaning of the policy period language in the policies at issue. Each of the American Employers' policies provides:

"This policy applies only to occurrences, as herein defined, which happen during the policy period."

To allow intervenors to reach into the future and include every occurrence would eviscerate the policy period contained in the policies. *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 313 (2001). Nothing in the American Employers' excess policies indicates that it intended to provide coverage past the finite policy period. See *Travelers Insurance Co.*, 197 Ill. 2d at 313.

Intervenors cite *Zurich Insurance Co. v. Raymark Industries, Inc.*, 118 Ill. 2d 23 (1987), *Maremont Corp. v. Continental Casualty Co.*, 326 Ill. App. 3d 272 (2001), and *Benoy Motor Sales, Inc. v. Universal Underwriters Insurance Co.*, 287 Ill. App. 3d 942 (1997), to support their argument. However, these cases are not dispositive in the case at bar. This court ruled in *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 283 Ill. App. 3d 630, 644 (1996), that *Zurich* does not apply to a case where, as here, a single continuous occurrence results in an unallocable loss implicating successive policy periods. See *Missouri Pacific R.R. Co.*, 288 Ill. App. 3d at 79. The *Maremont* and *Benoy* courts did not reach a decision regarding *pro rata* allocation. Accordingly, these cases are not applicable here.

Further, the intervenors argue that, even if *pro rata* allocation is appropriate, the period from October 1, 1985, to June 24, 1988, should not be included in the allocation period because no other insurance coverage was available to plaintiffs during that period. Intervenors' argument ignores that American Employers' insured plaintiffs for damages only during the policy periods of 1973 to 1976. Intervenors ignore that insurance coverage disputes are governed by contract law. *Outboard Marine*, 283 Ill. App. 3d at 644. This court previously explained that the damages for the years that an insured carried no insurance must be allocated to the insured. *Outboard Marine*, 283 Ill. App. 3d at 642. To allocate these damages to the insurer would be unfair. *Outboard Marine*, 283 Ill. App. 3d at 642. Even when an insurer agrees to indemnify an insured for "all sums," it has to be for sums incurred during the policy period. *Outboard Marine*, 283 Ill. App. 3d at 642. Because the policy periods contained in the American Employers' insurance policies do not include the years plaintiffs went uninsured, we fail to understand why American Employers' should have to bear the costs from that period. See *Outboard Marine*, 283 Ill. App. 3d at 643-44. We understand that insurance coverage was not available for the period at issue, but intervenors cannot shift responsibility for the uninsured years to American Employers'.

Intervenors overreach when they cite *Outboard Marine* to support their position. Intervenors contend that *Outboard Marine* stands for

the proposition that the uninsured period will be part of the *pro rata* period unless the insurer chose to go without coverage. While the insured in *Outboard Marine* went uninsured by choice, this was not the dispositive fact. Rather, this decision was based on fundamental principles of contract law, stating that it would be unfair to allocate the damages occurring during the uninsured period to an insurer that did not agree to provide coverage during that time. *Outboard Marine*, 283 Ill. App. 3d at 642-44.

■ On cross-appeal, American Employers' argues that the trial court erred by excluding from the *pro rata* allocation period the years covered by insurance policies written by companies that became insolvent. We agree with American Employers'.

The risk of an insurance carrier becoming insolvent is placed on the insured rather than on another carrier that was a stranger to the selection process. See *Sybron Transition Corp. v. Security Insurance of Hartford*, 258 F.3d 595, 598 (7th Cir. 2001). The insolvency of a successor excess carrier should not increase the liability of its predecessor. *Sybron Transition*, 258 F.3d at 598. Accordingly, we determine that the trial court erred by excluding the insolvent period from the *pro rata* allocation period.

■ Next, American Employers' argues that the trial court erred by holding that the policies covered the costs for emergency responses and IRMs. American Employers' argues that costs for the IRMs were not covered because they were not directly caused by an occurrence. Intervenors argue that the trial court properly found that the IRMs resulted from an occurrence based on the release of hazardous substances at the site. We agree with American Employers'.

An insurance policy is " '[a] contract whereby one undertakes to indemnify another against loss, damage, or liability arising from an unknown or contingent event and is applicable only to some contingency or act to occur in [the] future.' " (Emphasis omitted.) *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 103 (1992), quoting Black's Law Dictionary 721 (5th ed. 1979). If the insured knows or has reason to know, when it purchases a comprehensive general liability policy, that there is a substantial probability that it will suffer a loss, the risk ceases to be contingent and becomes a probable or known loss that will not be covered by the policy. *Liberty Mutual*, 154 Ill. 2d at 103.

The American Employers' policies covered damages directly caused by an occurrence, that is, an event or repeated exposure to conditions from 1973 to 1976 that resulted in property damage in those same years. The IRMs at issue are those performed in the early 1990s to properly close the landfill, namely: the removal of leachate from the

leachate lagoon, the grading of the top of the landfill to remove the bowl-shaped depression left by plaintiffs in 1988, the placing of an interim cap on the landfill, the placing of topsoil and seeding for vegetation, the removal of stained soil and pond water, and the placing of temporary erosion and drainage control. We fail to understand how the need to properly close the landfill was caused by an occurrence from 1973 to 1976. There was no evidence that the IRMs were performed due to the presence of volatile organic compounds in the groundwater. To the contrary, the evidence shows that these IRMs were performed because plaintiffs failed to properly close the landfill in 1988. The fact that the IRMs were ordered as part of the CERCLA action does not change the purpose of the IRMs. Plaintiffs knew or should have known when they purchased the American Employers' policies that they would have to properly close the landfill sometime in the future. Therefore, the trial court's findings that the costs of the IRMs and emergency measures were incurred because of an occurrence is against the manifest weight of the evidence.

Similarly, the cost for placing the interim cap on the landfill in 1992-93 was not due to an occurrence under the policy terms. Plaintiff knew or should have known that a cap would someday have to be placed on the landfill. Further, there is no evidence that the need to place an interim cap on the landfill in 1992-93 was caused by anything that occurred during the policy years of 1973-76.

Intervenors cite *Liberty Mutual*, 154 Ill. 2d 90, to support their argument. However, *Liberty Mutual* is distinguishable from the case at bar. In *Liberty Mutual*, the costs at issue were incurred for the removal of polychlorinated byphenyls (PCBs) from the North Ditch, Waukegan Harbor, and Lake Michigan. Without the discharge of the PCBs, the costs for removal would not have been incurred. In this case, the need to properly close the landfill was inevitable with or without the contamination that occurred. Therefore, *Liberty Mutual* is not dispositive of the issue in this case.

Intervenors also attempt to separate plaintiff/insured AAA from plaintiff/insured MIG. Any distinction is irrelevant to the question at issue because without an occurrence during the relevant time period there can be no coverage.

The judgment of the circuit court of Winnebago County is affirmed in part and reversed in part.

Affirmed in part and reversed in part.

GROMETER and CALLUM, JJ., concur.