Docket No. 103588.

IN THE

SUPREME COURT

OF

THE STATE OF ILLINOIS

KAJIMA CONSTRUCTION SERVICES, INC., *et al.*, Appellants, v. ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Appellee.

*Opinion filed November 29, 2007.*

CHIEF JUSTICE THOMAS delivered the judgment of the court, with opinion.

Justices Freeman, Fitzgerald, Kilbride, Garman, Karmeier, and Burke concurred in the judgment and opinion.

**OPINION**

Plaintiffs, Kajima Construction Services, Inc. (Kajima), a general contractor, and its insurer, Tokio Marine and Fire Insurance Company (Tokio), filed a declaratory judgment action in the circuit court of Cook County against St. Paul Fire and Marine Insurance Company (St. Paul) seeking reimbursement of funds that Tokio had paid to settle an underlying personal injury lawsuit. The parties filed cross-motions for summary judgment. The circuit court granted summary judgment in favor of St. Paul and against plaintiffs. The appellate court affirmed. 368 Ill. App. 3d 665. We subsequently allowed plaintiffs' petition for leave to appeal. 210 Ill. 2d R. 315. We also allowed Complex Insurance Claims Litigation Association to file an

*amicus* brief in support of St. Paul. For the reasons that follow, we affirm the judgment of the appellate court.

## BACKGROUND

In December 1997, Kajima entered into a subcontract with Midwestern Steel Fabricators, Inc. (Midwestern), for a construction project. Pursuant to the subcontract, Midwestern was required to maintain commercial general liability (CGL) coverage for Kajima as an additional insured. Midwestern therefore provided Kajima with a certificate of insurance from St. Paul naming Kajima as an additional insured and providing Kajima with $2 million in general liability coverage and $5 million in umbrella coverage. Kajima also had its own primary CGL insurance policy with Tokio with limits of $1 million per occurrence.

Midwestern subcontracted a portion of its contract with Kajima to Up-Rite Steel Company (Up-Rite). On or around December 20, 1997, Thomas Jones, an employee of Up-Rite, was injured while working on the construction project. On February 2, 1998, Jones filed a personal injury lawsuit against Kajima and Midwestern. On March 3, 1998, Kajima made a "targeted tender" to Midwestern and St. Paul for its defense and indemnity in the Jones lawsuit. Pursuant to the "targeted tender," Kajima stated that it was exercising its right to elect St. Paul to provide Kajima with the exclusive defense and indemnification in the Jones case. Kajima renewed its tender to Midwestern and St. Paul on May 11, 1998, and on June 4, 1998. When St. Paul did not accept the tender, Kajima requested that Tokio handle the matter and pursue the defense and indemnity owed to Kajima. On August 15, 2000, St. Paul finally accepted Kajima's targeted tender under a reservation of rights.

Prior to trial of the Jones case, Tokio demanded that St. Paul settle the Jones lawsuit for $3 million from its primary and umbrella insurance policies. St. Paul refused to do so. In June 2001, during trial, the case settled for $3 million, with St. Paul paying its primary limits of $2 million, and Tokio contributing its primary limits of $1 million. Kajima and Tokio then filed the declaratory judgment action against St. Paul seeking reimbursement of the $1 million that Tokio had contributed to the settlement.

-2-

The parties filed cross-motions for summary judgment. Kajima and Tokio argued that based upon the targeted tender rule, St. Paul was solely responsible for the defense and indemnification of Kajima without contribution from Tokio. St. Paul responded that although the targeted tender rule allowed Kajima to tender its defense and indemnification to one of several insurers that potentially cover the same risk, Illinois law also provides that all primary policies must be exhausted prior to reaching an excess policy. On March 14, 2005, the circuit court of Cook County granted St. Paul's motion for summary judgment and denied plaintiffs' motion for summary judgment.

The appellate court affirmed the circuit court. 368 Ill. App. 3d 665. The appellate court noted that an insured has the right to selectively tender its defense and indemnification to one of several common carriers. 368 Ill. App. 3d at 669. However, Illinois courts also apply horizontal exhaustion, which requires an insured who has multiple primary and excess policies covering a common risk to exhaust all primary policy limits before invoking excess coverage. 368 Ill. App. 3d at 669. The appellate court rejected plaintiffs' argument that because Kajima selectively tendered its defense and indemnification to St. Paul, St. Paul must respond with both its primary and excess coverage before Tokio's primary limits are invoked. The appellate court held that "the selective tender rule should be applied to circumstances where concurrent insurance coverage exists for additional insureds." 368 Ill. App. 3d at 672. However, "[t]o the extent that defense and indemnity costs exceed the primary limits of the selected insurer, the deselected insurer or insurers' primary policies must answer for the loss prior to invoking coverage under an excess policy." 368 Ill. App. 3d at 672. The appellate court therefore affirmed the circuit court's order granting St. Paul's motion for summary judgment and denying plaintiffs' motion for summary judgment.

## ANALYSIS

Summary judgment is appropriate where the pleadings, depositions, admissions and affidavits on file, viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2–1005(c) (West 2006);

*Hall v. Henn*, 208 Ill. 2d 325, 328 (2003). This court conducts a *de novo* review of an order granting summary judgment. *Hall*, 208 Ill. 2d at 328.

The appellate court characterized the issue in this case as "whether the selective tender rule supersedes well-settled principles of Illinois law regarding horizontal exhaustion." 368 Ill. App. 3d at 668. Consequently, our analysis begins with a discussion of horizontal exhaustion and the selective or targeted tender rule.

Our appellate court first addressed whether an insured must exhaust all available primary insurance before seeking coverage from any excess policy in *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598 (1994). In that case, Gypsum, the insured, argued that an excess insurer was required to provide coverage once the primary policy underlying its excess policy was exhausted, regardless of whether there were concurrent primary or excess insurance policies. *Gypsum*, 268 Ill. App. 3d at 653. The appellate court disagreed, noting that allowing Gypsum to pursue such "vertical exhaustion" would allow it to:

> "effectively manipulate the source of its recovery, avoiding difficulties encountered as the result of its purchase of fronting insurance and the liquidation of some of its insurers. This would permit Gypsum to pursue coverage from certain excess insurers at the exclusion of others. Such a practice would blur the distinction between primary and excess insurance [citation], and would allow certain primary insurers to escape unscathed when they would otherwise bear the initial burden of providing indemnification." *Gypsum*, 268 Ill. App. 3d at 654.

The appellate court therefore held that "horizontal exhaustion" was required, and that Gypsum must exhaust all available primary coverage before proceeding against an excess insurer. *Gypsum*, 268 Ill. App. 3d at 654.

Following the decision in *Gypsum*, the appellate court continued to apply horizontal exhaustion to require an insured to first exhaust all available primary insurance coverage, including self-insured periods, before an excess policy can be reached. See *AAA Disposal Systems, Inc. v. Aetna Casualty & Surety Co.*, 355 Ill. App. 3d 275 (2005);

*Maremont Corp. v. Continental Casualty Co.*, 326 Ill. App. 3d 272 (2001); *New Hampshire Insurance Co. v. Hanover Insurance Co.*, 296 Ill. App. 3d 701 (1998); *Missouri Pacific R.R. Co. v. International Insurance Co.*, 288 Ill. App. 3d 69 (1997); *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 283 Ill. App. 3d 630 (1996).

In contrast to horizontal exhaustion, the "targeted" or "selective" tender doctrine allows an insured covered by multiple insurance policies to select or target which insurer will defend and indemnify it with regard to a specific claim. The appellate court first addressed targeted tender in *Institute of London Underwriters v. Hartford Fire Insurance Co.*, 234 Ill. App. 3d 70 (1992).

In that case, the Great Lakes Towing Company had a primary policy with Hartford Fire Insurance Company and was an additional insured under a policy issued by the Institute of London Underwriters. Great Lakes was sued for wrongful death and tendered defense of the suit to London Underwriters. Great Lakes notified Hartford of the suit, but requested that Hartford not participate in the suit. London Underwriters settled the case, then filed a declaratory judgment seeking a declaration that Hartford was obligated to pay 50% of the settlement.

The *London Underwriters* court first held that because the insured told Hartford that it did not want Hartford to respond to the claim, Hartford's knowledge of the wrongful-death claim did not constitute a tender. *London Underwriters*, 234 Ill. App. 3d at 75. The appellate court rejected the argument that London Underwriter's "other insurance" clause required Hartford to contribute to the settlement, holding that if the Hartford policy was never triggered, "the issue of liability under the 'other insurance' clause does not arise." *London Underwriters*, 234 Ill. App. 3d at 77. The court explained that:

> "Great Lakes may well have feared that if the loss were attributed to its policy with Hartford the result might be a rise in premiums or cancellation of its policy. This factor alone suggests the insured ought to have the right to seek or not to seek an insurer's participation in a claim as the insured chooses when more than one carrier's policy covers the loss." *London Underwriters*, 234 Ill. App. 3d at 78-79.

The court recognized that an "insured's actions after a loss may foreclose his right to coverage under a policy and, thus, defeat a claim for equitable contribution by another insurance carrier." *London Underwriters*, 234 Ill. App. 3d at 78.

This court cited *London Underwriters*' discussion of targeted tender with approval in *Cincinnati Cos. v. West American Insurance Co.*, 183 Ill. 2d 317 (1998). Although targeted tender was not at issue in the case, this court discussed targeted tender in addressing whether an insurer's duty to defend its insured arose upon receipt of actual notice of the suit against the insured, or whether the duty to defend was triggered only upon the insured's tender of its defense to the insurer. Defendant West American argued that allowing actual notice of an underlying suit to trigger an insurer's duty to defend would deprive an insured of the right to forgo coverage under a policy. In rejecting that argument, this court cited *London Underwriters* and held that an insured may forgo an insurer's assistance for various reasons, such as a fear that its premiums would be increased or the policy cancelled in the future. *Cincinnati Cos.*, 183 Ill. 2d at 326. This court also held that an insured's ability to forgo an insurer's assistance should be protected, and concluded that an insured may knowingly forgo an insurer's assistance by instructing the insurer not to involve itself in the litigation. *Cincinnati Cos.*, 183 Ill. 2d at 326. At that point, the insurer would be relieved of its obligation to the insured with regard to that claim. *Cincinnati Cos.*, 183 Ill. 2d at 326.

Following our decision in *Cincinnati Cos.*, the appellate court again addressed the issue of targeted tender. In *Bituminous Casualty Corp. v. Royal Insurance Co. of America*, 301 Ill. App. 3d 720 (1998), the appellate court held that general contractor Johnson Construction was entitled to request exclusive coverage as an additional insured with its subcontractor's insurer, Bituminous Casualty Corp., and to knowingly forgo assistance from its CGL insurer, Royal Insurance Company of America. The appellate court rejected Bituminous Casualty's argument that Royal was required to provide coverage pursuant to the "other insurance" clauses found in both insurers' policies. *Bituminous Casualty*, 301 Ill. App. 3d at 725. The appellate court held:

> "It is only when an insurer's policy is triggered that the insurer becomes liable for the defense and indemnity costs of

a claim and it becomes necessary to allocate the loss among co-insurers. The loss will be allocated according to the terms of the 'other insurance' clauses, if any, in the policies that have been triggered." *Bituminous Casualty*, 301 Ill. App. 3d at 726.

In *Alcan United, Inc. v. West Bend Mutual Insurance Co.*, 303 Ill. App. 3d 72 (1999), the appellate court held that an insured could "deactivate" coverage with an insurer it had previously selected in order to invoke exclusive coverage with another insurer. In that case, the insured, Alcan, tendered its defense in a personal injury case to its insurer, Reliance National Insurance Company (Reliance). Reliance later tendered the claim to West Bend Mutual Insurance Company (West Bend), which insured Alcan as an additional insured on a policy with Alcan's subcontractor. West Bend did not respond to the tender. In cross-motions for summary judgment filed in Alcan's complaint for declaratory judgment, West Bend argued that Reliance was jointly liable with West Bend because Alcan had tendered the personal injury lawsuit to Reliance; Reliance had assumed Alcan's defense following that tender; and, once activated, Reliance's policy remained operative. *Alcan United*, 303 Ill. App. 3d at 76.

The *Alcan United* court rejected West Bend's argument. The court noted that when Alcan first tendered the personal injury lawsuit to Reliance, Alcan did not know of the existence of simultaneous coverage through West Bend's policy. *Alcan United*, 303 Ill. App. 3d at 82. Consequently, it could not be said that Alcan made a knowing choice when it tendered the claim to Reliance. *Alcan United*, 303 Ill. App. 3d at 82. Upon discovering West Bend's policy, Alcan tendered the suit to West Bend, seeking exclusive coverage from West Bend and deactivating its tender to Reliance. *Alcan United*, 303 Ill. App. 3d at 82. The appellate court held that an "insured has a paramount right to choose or not to choose an insurer's participation in a claim." *Alcan United*, 303 Ill. App. 3d at 83. Because an insured has the option to choose coverage, it follows that an insured should also "be permitted to deactivate coverage with a carrier previously selected for purposes of invoking exclusive coverage with another carrier," particularly when the deactivation is based upon the discovery of other coverage. *Alcan United*, 303 Ill. App. 3d at 83.

This court ratified the appellate court decisions in *Bituminous Casualty* and *Alcan United* in *John Burns Construction Co. v.*

*Indiana Insurance Co.*, 189 Ill. 2d 570 (2000). In *Burns Construction*, this court directly addressed the targeted tender doctrine. In that case, John Burns Construction Company entered into a subcontract with Sal Barba Asphalt Paving, Inc., to pave a parking lot at a railroad station. Pursuant to the subcontract, Barba arranged for Burns Construction to be added to Barba's policy with defendant Indiana Insurance Company as an additional insured. After construction work was completed, Sidney Gault slipped and fell in the railroad station parking lot, and sued Burns Construction for his injuries.

Burns Construction thereafter notified Barba of the suit and asked that Barba's insurer, Indiana, defend and indemnify Burns Construction in the Gault action. The letter stated that Burns Construction looked solely to Indiana for defense and indemnification, and explained that it did not want its own insurer, Royal Insurance Company, to become involved in the suit. Indiana refused to defend Burns Construction, so Burns Construction then sought defense from Royal Insurance. Burns Construction and Royal filed an action for declaratory judgment seeking a declaration that Indiana alone had the duty to defend and indemnify Burns Construction. The circuit court held that both Royal and Indiana were required to contribute equally to Burns Construction's defense and indemnification, concluding that Royal's duty to defend was triggered when Burns tendered the case to Royal following Indiana's refusal to defend. *Burns Construction*, 189 Ill. 2d at 573. The appellate court affirmed the circuit court, but held that Burns Construction's initial tender to Indiana triggered the "other insurance" provision in Indiana's policy, which in turn activated Royal's duty to defend Burns Construction. *Burns Construction*, 189 Ill. 2d at 573.

This court reversed the lower courts, holding that Burns Construction had the right to choose which insurer would be required to defend and indemnify it in the Gault case, and that nothing in the Indiana policy limited Burns Construction's right to select which insurer would be required to defend. *Burns Construction*, 189 Ill. 2d at 574. Agreeing with the appellate court decisions in *Bituminous Casualty* and *Alcan United*, this court held that an "other insurance" provision does not in itself overcome an insured's right to tender defense of an action to one insurer alone. *Burns Construction*, 189 Ill.

2d at 578. Finally, this court rejected Indiana's claim that the Royal policy was triggered when Burns Construction notified Royal of the Gault action. This court held:

> "In the present case, however, Burns made clear that it did not want Royal to become involved in the matter and that the defense was being tendered solely to Indiana. Therefore, Indiana was foreclosed from seeking equitable contribution from Royal. When Burns tendered defense of the claim to Royal, it did so only after Indiana declined to represent Burns. Indiana cannot now take advantage of its own breach." *Burns Construction*, 189 Ill. 2d at 578.

With the preceding discussion of the targeted tender rule and the principles of horizontal exhaustion in mind, we now address whether the appellate court correctly held that targeted tender does not supersede horizontal exhaustion in the context of primary and excess insurance. At the outset we note that our prior decisions addressing targeted tender are not entirely on point, as those cases did not involve excess insurance policies. Kajima and Tokio (hereinafter collectively referred to as Kajima) argue that, pursuant to the targeted tender rule, Kajima had the absolute right to tender its defense and indemnification in the Jones case to St. Paul. Once Kajima made a targeted tender to Midwestern and St. Paul, Kajima's insurer, Tokio, became "deselected" and was relieved of its obligation to Kajima with regard to the Jones claim. The Tokio policy thus was no longer "available," and St. Paul had the sole responsibility to defend and indemnify Kajima.

Kajima acknowledges that horizontal exhaustion requires an insured to exhaust all available primary limits before invoking excess coverage. Kajima states that horizontal exhaustion cannot coexist with targeted tender in circumstances such as those presented in this case. Kajima contends that because targeted tender is the more recent of the two doctrines, and is the doctrine adopted by this court, this court must hold that targeted tender prevails over horizontal exhaustion.

St. Paul responds that this court need not resolve the alleged conflict between horizontal exhaustion and targeted tender because this case does not involve horizontal exhaustion. St. Paul maintains that the doctrine of horizontal exhaustion evolved from cases involving bodily injury or property damage spanning multiple policy

periods over several years of coverage. St. Paul claims that this case can be decided based upon the differences between primary and excess insurance coverage. Given the fundamental purpose of an umbrella excess insurance policy, the appellate court properly held that Kajima must exhaust the limits of all of its concurrent primary policies before receiving coverage under its excess policy.

We first address St. Paul's claim that this case does not involve horizontal exhaustion. Although it is true that horizontal exhaustion originated in cases involving a continuous tort or long-term environmental and hazardous waste claims, we find no evidence that horizontal exhaustion is limited to such claims. In fact, the *Gypsum* court noted that its interpretation of the excess policy at issue clearly sets forth the policy's status as an excess policy "to all triggered primary policies, regardless of whether they extend over multiple policy periods or *only one*." (Emphasis added.) *Gypsum*, 268 Ill. App. 3d at 653. Moreover, the *Gypsum* court's rejection of vertical exhaustion and adoption of horizontal exhaustion was based upon the differences between primary and excess insurance. The court noted that recognizing vertical exhaustion would "blur the distinction between primary and excess insurance [citation], and would allow certain primary insurers to escape unscathed when they would otherwise bear the initial burden of providing indemnification." *Gypsum*, 268 Ill. App. 3d at 654. Given that the crux of horizontal exhaustion is the difference between primary and excess insurance, we see no reason to depart from horizontal exhaustion in this case.

Accordingly, we next must address Kajima's claim that the targeted tender doctrine prevails over horizontal exhaustion. As discussed, horizontal exhaustion is based on a recognition of the difference between primary and excess insurance. With regard to primary and excess insurance, we find Justice Freeman's separate writing in *Roberts v. Northland Insurance Co.*, 185 Ill. 2d 262, 275 (1998) (Freeman, C.J., concurring in part and dissenting in part), to be particularly instructive. Justice Freeman explained that when excess insurance exists as part of an overall insurance package, it provides a secondary level of coverage to protect the insured where a judgment or settlement exceeds the primary policy's limits of liability. *Roberts*, 185 Ill. 2d at 276-77 (Freeman, C.J., concurring in part and dissenting in part, joined by Miller and McMorrow, JJ.). Excess insurance

-10-

coverage " 'attaches only after a predetermined amount of primary insurance or self-insured retention has been exhausted.' " *Roberts*, 185 Ill. 2d at 277 (Freeman, C.J., concurring in part and dissenting in part, joined by Miller and McMorrow, JJ.), quoting S. Seaman & C. Kittredge, *Excess Liability Insurance: Law and Litigation*, 32 Tort & Ins. L.J. 653, 656 (1996). Consequently, until " 'the limits of primary insurance coverage are exhausted, secondary coverage does not provide any collectible insurance.' " *Roberts*, 185 Ill. 2d at 277 (Freeman, C.J., concurring in part and dissenting in part, joined by Miller and McMorrow, JJ.), quoting *Whitehead v. Fleet Towing Co.*, 110 Ill. App. 3d 759, 764-65 (1982). Once an excess policy is triggered in a case, the limits of the primary insurance must be exhausted before the excess carrier will be required to contribute to a settlement or judgment. *Roberts*, 185 Ill. 2d at 278 (Freeman, C.J., concurring in part and dissenting in part, joined by Miller and McMorrow, JJ.).

Justice Freeman further noted that the circumstances under which excess insurance might come into play in a case might vary. Thus, excess coverage might arise "by coincidence" when multiple primary insurance contracts apply to the same loss. *Roberts*, 185 Ill. 2d at 277 (Freeman, C.J., concurring in part and dissenting in part, joined by Miller and McMorrow, JJ.). In contrast, "true" excess insurance coverage is purchased by the insured in separate contracts that are written by design and are known as "following form" or "specific" excess coverage. *Roberts*, 185 Ill. 2d at 277 (Freeman, C.J., concurring in part and dissenting in part, joined by Miller and McMorrow, JJ.). An "umbrella" insurance policy presents yet another form of excess coverage. An umbrella policy provides both a standard "following form" excess coverage, and in some circumstances may provide broader coverage than that otherwise provided by the underlying primary carrier. *Roberts*, 185 Ill. 2d at 278 (Freeman, C.J., concurring in part and dissenting in part, joined by Miller and McMorrow, JJ.).

St. Paul's excess policy in this case is entitled "Umbrella Excess Liability Protection Coverage." The policy provides that it will pay damages that are covered by the policy and by the insured's basic insurance, which exceed the basic insurer's payment of the limits of coverage in the basic insurance, other than the insured's total limits.

The policy also provides that it will pay amounts any protected person is required to pay as damages for injury or damage that is covered by the excess policy and is not covered by the insured's basic insurance, limited by the amounts that are excess of the deductible or excess of amounts payable by other insurance, whichever is greater. St. Paul's umbrella policy, then, is a "true" excess policy. "An examination of the premiums generally charged for umbrella coverage *** reflects an intent that umbrella policies serve a different function." *Illinois Emcasco Insurance Co. v. Continental Casualty Co.*, 139 Ill. App. 3d 130, 133 (1985). "[E]xcess premiums are lower because excess coverage is, by its very nature, not supposed to be triggered until the underlying policy has been exhausted up to its limits." *Roberts*, 185 Ill. 2d at 281 (Freeman, C.J., concurring in part and dissenting in part, joined by Miller and McMorrow, JJ.).

Given the clear distinctions between primary and excess insurance coverage, we decline to extend the targeted tender doctrine to require one insurer to vertically exhaust its primary and excess coverage limits before all primary insurance available to the insured has been exhausted. Extending the targeted tender rule to require an excess policy to pay before a primary policy would eviscerate the distinction between primary and excess insurance. Moreover, as has been suggested, "if *John Burns* [*Construction*] is taken to its logical conclusion, it seems possible for an insured to deselect all of its primary insurers and tender only to its excess insurers." T. Hamilton & T. Stark, *Excess-Primary Insurer Obligations and the Rights of the Insured*, 69 Def. Couns. J. 315, 324 (2002). Consequently, we find that the better rule is that set forth by the appellate court–that targeted tender can be applied to circumstances where concurrent primary insurance coverage exists for additional insureds, but to the extent that defense and indemnity costs exceed the primary limits of the targeted insurer, the deselected insurer or insurers' primary policy must answer for the loss before the insured can seek coverage under an excess policy. This holding preserves the distinction between primary and excess insurance policies.

We therefore find that despite Kajima's targeted tender to St. Paul, Kajima was required to exhaust its primary policies before invoking St. Paul's excess coverage. For that reason, Tokio was not

entitled to reimbursement from St. Paul of the $1 million that Tokio paid toward the Jones settlement.

Finally, given our finding that Kajima was required to exhaust all of its primary insurance before invoking coverage under St. Paul's excess policy, we need not address St. Paul's alternative argument that targeted tender does not apply in this case because Kajima did not knowingly forgo coverage from Tokio.

## CONCLUSION

For the foregoing reasons, we find that the targeted tender rule does not preempt horizontal exhaustion. Consequently, to the extent that defense and indemnity costs exceed the primary limits of a targeted insurer, the deselected insurer or insurers' primary policy must answer for the loss before an insured can invoke coverage under an excess policy. The judgment of the appellate court therefore is affirmed.

*Appellate court judgment affirmed.*