# ILLINOIS OFFICIAL REPORTS

## Appellate Court

***Dixon v. Weitekamp-Diller*, 2012 IL App (4th) 120209**

| | |
|---|---|
| Appellate Court Caption | SHERWOOD DIXON, ANNE DIXON BEST, DRAKE DIXON, RIDGEWAY RYAN, ROSALIE RYAN, and WALKER RYAN, Plaintiffs-Appellees, v. BARBARA WEITEKAMP-DILLER, Individually and as Trustee of the William Hughes Diller, Jr., Revocable Trust Dated July 28, 2010; JUDITH ANN NEAL; BRENDA BRUCE; SUSAN WEITEKAMP; and MARGARET WEITEKAMP, Defendants-Appellants, and UNITED COMMUNITY BANK, as Successor Trustee of the Trust Created Under Item Second of the Will of William Hughes Diller, Sr.; JPMORGAN CHASE BANK, N.A., Formerly Springfield Marine Bank, as Trustee of the 1927 Ida Payne Trust and as Trustee of the 1949 William Hughes Diller, Sr., Trust; and HEARTLAND AG GROUP OF SPRINGFIELD, INC.; and DILLER RYAN, Defendants. |
| District & No. | Fourth District<br>Docket No. 4-12-0209 |
| Argued | September 27, 2012 |
| Filed | November 5, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Although the Adoption Act provides that an adopted child is the descendant of the adopting parent for purposes of inheritance, that provision only applies where a contrary intention is not plainly shown, and where plaintiff's decedent, a bachelor his entire life, married his assistant at the age of 87 and adopted her grown daughters in an attempt to circumvent the trusts created by decedent's parents that left the trust to decedent's descendants upon his death, the trial court properly found the adoptions were a subterfuge and ordered the trustees to distribute the trust as if decedent had no children. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 10-CH-1014; the Hon. Leo J. Zappa, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Barry O. Hines (argued) and Roger L. Rutherford, of Rutherford Law Office, both of Springfield, and Stanley W. Plappert, of Florida Legal Advocacy Group, P.A., of Ocala, Florida, for appellants. |
| | R. Kurt Wilke (argued) and Matthew J. Cate, both of Barber, Segatto, Hoffee, Wilke & Cate, of Springfield, for appellees. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion. |
| | Presiding Justice Turner and Justice Pope concurred in the judgment and opinion. |

## OPINION

¶ 1     This case involves three trusts, each of which includes a life estate in the proceeds from farmland for William Hughes Diller, Jr. (Hughes), with the *res* of each trust to be distributed, at least in part, to Hughes' children at his death. The trusts further provide, however, that if Hughes were to die without any children, the *res* of each trust would be distributed to his sisters' children *per stirpes*.

¶ 2     After having spent the first 87 years of his life unmarried, Hughes married his former assistant, Barbara Weitekamp, and moved with her to Florida. In August 2010, concerned about Barbara's role in Hughes' financial affairs and that she was keeping Hughes away from them, members of Hughes' family filed a complaint to appoint a successor trustee and for declaratory relief. Shortly thereafter, Barbara arranged for then 94-year-old Hughes to adopt three of her adult daughters from a previous marriage. Hughes did so and died several months later.

¶ 3     Following an exchange of motions, the trial court ordered the trustees to administer and distribute the trusts as if Hughes did not have any children, finding, in pertinent part, that the adoptions of Barbara's daughters were subterfuge and done "solely to make Barbara's daughters heirs *** under the three trusts."

¶ 4     Barbara and her daughters appeal, arguing that the trial court erred by granting plaintiffs' motion for summary judgment because (1) Illinois law presumes that an adopted child is the

-2-

descendant of the adoptive parent and (2) the court improperly determined that 63 acres Hughes purchased as trustee of one of the family trusts–which he later transferred to Barbara–should remain part of the trust. We disagree and affirm.

## I. BACKGROUND

### A. The Diller Family and the Family Trusts

Hughes was born the only boy to his mother and father. His sisters, Corrine Diller Ryan and Jane Diller Dixon, predeceased him, leaving plaintiffs Sherwood Dixon, Anne Dixon Best, Drake Dixon, Ridgeway Ryan, Rosalie Ryan, Walker Ryan, and Diller Ryan as blood-relative descendants.

In 1901, Hughes' grandfather, Isaac R. Diller, sold the family business and invested in central Illinois farmland. Hughes later inherited a lifelong interest in much of that farmland but also became an income beneficiary in the following Diller family farm trusts: (1) the Franklin Farm Trust, which Hughes' father, William H. Diller, Sr. (hereinafter Diller Sr.), created under his will (Diller Sr. died in 1977); (2) the William H. Diller, Sr., Trust, a separate trust created by Diller Sr. in 1949; and (3) the Ida Payne Trust, which Hughes' maternal grandmother created in 1927.

### 1. *The Franklin Farm Trust*

The Franklin Farm Trust originally consisted of 1,453 aces of farmland in Morgan County, Illinois. Diller Sr. named Hughes as trustee and provided that all of the income from the trust would be paid to Hughes during Hughes' lifetime. The terms of the trust disposed of the trust assets upon Hughes' death, as follows:

> "Upon the death of my son, William Hughes Diller, Jr., if he shall leave him surviving a wife or any child or children or descendants thereof, this trust shall continue so long as said wife shall live and until the youngest of his children attains majority. *** Net income shall be distributed one half to the wife of my son and one half to his descendants per stirpes and upon death of such wife or if his wife shall predecease him all income to his descendants per stirpes, or if there be no descendants of my son or such descendants shall die before termination of this trust one half of all net income shall go to my son's wife and the remaining one half of the net income to my daughters, Connie Diller Ryan and Jane Diller Dixon, or their respective descendants per stirpes then living. *** Upon the death of the wife of my son and attainment of majority of my son's then youngest living child, this trust shall terminate and the trust property shall vest in the children of my son and the descendant of any deceased child then living, such descendants taking the share per stirpes their parent would have received if living. *** If my son shall die without any wife or child or children or descendants of a deceased child or children surviving him, or if none of my son's descendants shall live to attain their majority, this trust shall terminate and the trust property shall vest in my daughters, Corinne Diller Ryan and Jane Diller Dixon, or if either be not then living in their respective descendants per stirpes then living, or if either has no descendants then living shall vest in the descendants of the other."

Hughes later retained Gene Meurer of Marine Bank's farm management department in Springfield, Illinois, and later codefendant, Heartland Ag Group of Springfield, to manage the Franklin Farm.

¶ 11                              2. *The William H. Diller, Sr., Trust*

¶ 12        The William H. Diller, Sr., Trust, a trust created by Diller Sr. in 1949, consisted of 712 acres of farmland in central Illinois. Diller Sr. named Marine Bank, now codefendant JPMorgan Chase Bank, N.A., as trustee. This 1949 trust stated, in pertinent part, as follows:

> "All income not required for maintenance, repairs, taxes, farm expenses, interest, cost and fees incident to the management of this trust shall be distributed not less than annually to my children, William Hughes Diller, Jr., Corinne Diller Ryan and Jane Diller Dixon, in equal shares, and in the event of death of any of my children such share of income shall be payable to his or her descendants per stirpes, or if there be no such descendants then surviving or upon their subsequent death, such shares of income shall be given to my surviving children equally, or to their respective descendants per stirpes. This trust shall terminate upon the death of the last survivor of my three children. \*\*\* Upon termination, the principal of this trust shall be distributed to the beneficiaries in the proportions in which they are then receiving trust income."

¶ 13                                 3. *The Ida Payne Trust*

¶ 14        The Ida Payne Trust, a trust created in 1927, consisted of 167 acres of farmland in Christian County, Illinois. Payne named Springfield Marine Bank, now JPMorgan Chase Bank, as trustee. Payne had three children, one of whom was Hughes' mother. Payne provided that after she and her husband died, the trust income would be paid to her six grandchildren. The Ida Payne Trust was set to terminate upon the death of her last surviving grandchild, thereafter distributed to each of their descendants, as follows:

> "To pay one of said one-third parts to William Hughes Diller, Corinne Payne Diller and Jane Louise Diller, grandchildren of the Grantor and being the children now living of Corinne Payne Diller, deceased daughter of the Grantor, said payments to be made to said grandchildren in equal parts during their respective lifetimes.
>
> Upon the death of either of said grandchildren in this item mentioned, prior to the termination of this trust, leaving lawful issue him or her surviving, said Trustee shall pay to the said lawful issue of said deceased grandchild per stirpes, that part of said income to which said deceased grandchild would have been entitled if living.
>
> If either of said grandchildren die leaving no lawful issue him or her surviving, or if such grandchild die leaving issue him or her surviving but issue shall die prior to the termination of this trust, then said Trustee shall pay to the other of the said grandchildren in this item mentioned, if living or if dead, leaving issue him or her surviving, then to said issue, per stirpes, that part of said income to which said first mentioned grandchild would have been entitled if living \*\*\*.
>
> Upon death of the survivor of the said grandchildren \*\*\* said trust shall cease and

the Trustee shall convey said trust estate *** to those persons who may at the termination of said trust estate be entitled to receive the income therefrom in the proportions to which they are then respectively entitled to the income of said trust estate."

Pursuant to the aforementioned trust terms, the Ida Payne Trust income was distributed equally between (1) Hughes, Corinne, and Jane, and (2) Nanette Payne Thomas's grandchildren. Under the terms of the trust, the assets of the trust would ultimately be distributed to Ida Payne's great-grandchildren through whichever of her grandchildren had children of their own. Hughes was the last of the grandchildren to survive.

¶ 15                            B. Hughes and the Weitekamps

¶ 16        In 1972, Howard and Barbara Weitekamp, along with their seven children, moved to a home across the street from the home that Hughes shared with his father, Diller Sr. One of Barbara's children, Margaret Weitekamp, helped Hughes keep his father's house clean. Sometime after Diller Sr. died in 1977, Hughes hired Barbara to perform bookkeeping for him.

¶ 17        In 1997, Hughes named Barbara as his agent under a power of attorney. Fred Hoffmann, Hughes' long-time family attorney, prepared that 1997 power of attorney.

¶ 18        In April 1999, Hughes, who was then 82 years old, was seriously injured in a fire at his home. As a result, Hughes spent several weeks in the hospital. During a visit to the hospital, Hoffmann confronted Barbara about her actions on behalf of Hughes. During that confrontation, Barbara revealed that she was charging Hughes $130 to $150 per hour to visit with Hughes at the hospital. Hoffmann objected, and Barbara responded that she felt "entitled to it" because she did not expect Hughes to survive his injuries.

¶ 19        Hoffmann explained that Barbara did not appear to be interested in taking his advice. Hoffmann later attempted to have the 1997 power of attorney revoked, but was thereafter "dismissed" as Hughes' attorney. Barbara replaced Hoffmann as executor of Hughes' will. Later that year, Hughes retained attorney Ed Cunningham to represent him.

¶ 20        When Hughes returned home from the hospital, Barbara's daughter, Judith Weitekamp, and her husband moved into Hughes' home for approximately a year to assist with Hughes' recuperation. Hughes' insurance company paid Judith for the care she provided that year.

¶ 21        In September 1999, Barbara's husband died. In early 2000, Barbara's relationship with Hughes "shifted," and in 2004, the couple married in Naples, Florida. Hughes, who was 87 years old at the time, had never been married and had no children; Barbara was 71 years old. Cunningham explained that Hughes and Barbara "struck a deal, you know, Hughes was very lonely ***[,] she was taking care of him, and he was going to take care of her so to speak." Hughes and Barbara lived together in Springfield, and in 2005, purchased a second home in Florida.

¶ 22        In May 2010, Hughes fell and injured his head. When Hughes was released from the hospital, Barbara moved Hughes into a nursing facility.

¶ 23        In June 2010, Barbara removed Hughes from the nursing facility in Illinois to an assisted living facility in Florida. During the move, Barbara signed a document to delegate the agency

under Hughes' power of attorney to Judith–who had since moved to Florida as well–so that Judith could act as Hughes' agent in Barbara's absence. During part of 2010, Barbara paid Judith $2,000 per month for assisting with Hughes.

¶ 24      In July 2010, Ernest Moody of Heartland Ag Group informed the Diller family about Barbara's actions and explained that they should go to Florida to attempt to talk to Hughes. Barbara discovered Moody's communication to the family. The next day, (1) Barbara removed Hughes from the assisted living facility and (2) Barbara's Florida attorney sent a "Notice of Termination" to Heartland Ag Group, terminating its relationship with Hughes.

¶ 25      Shortly thereafter, several members of the Diller family traveled to Florida to see Hughes. Barbara admitted that she thwarted the family's efforts, and the family was unable to speak to him.

### C. The Diller Family Files a Complaint and Hughes Adopts Barbara's Daughters

¶ 27      In August 2010, plaintiffs, Hughes' family, filed a complaint to appoint a successor trustee and for declaratory relief. Barbara's attorney thereafter contacted JPMorgan Chase Bank to get copies of the 1949 Diller trust and 1927 Ida Payne trust.

¶ 28      In September 2010, Barbara's Florida attorney filed an adoption petition and consent to allow 94-year-old Hughes to adopt 55-year-old Judith, who was herself a grandmother. Following a hearing held later that month, Hughes adopted Judith. In November 2010, defendants filed a motion to dismiss plaintiffs' August 2010 complaint, asserting that Judith's recent adoption eliminated plaintiffs' inheritance interests under the trusts.

¶ 29      Plaintiffs thereafter attempted to speak with and depose Hughes in Florida. When Hughes failed to appear for a deposition, plaintiffs found that he had been hospitalized. Barbara acknowledged that she attempted to have the hospital block the Diller family from visiting Hughes.

¶ 30      The hospital discharged Hughes in February 2011, and Hughes was placed in an assisted living facility. Following an April 2011 hearing, Hughes adopted three more of Barbara's children, Brenda, Margaret, and Susan, all in their 50s. Two months later, Hughes died.

### D. The Trial Court's Findings and Written Order

¶ 32      In February 2012, following a two-year exchange of motions by the parties, the trial court entered a written order, granting the plaintiffs' motion for summary judgment. The court found that (1) the Florida adoptions of Barbara's daughters were done "solely to make Barbara's daughters heirs *** under the three trusts"; (2) Diller Sr. and Ida Payne did not intend for the remainder interests under the three trusts to pass to "non-family members who were adopted long after they became adults and were never raised by the Diller family"; and (3) the 63-acre tract Hughes purchased in 1992 as part of his fiduciary duty as trustee of the Diller Sr. Trust was treated as part of the Diller Sr. Trust, rendering a November 2010 conveyance of that tract improper.

¶ 33      This appeal followed.

¶ 34                              II. ANALYSIS

¶ 35    Barbara and her daughters argue that the trial court erred by granting plaintiffs' motion
for summary judgment because (1) Illinois law presumes that an adopted child is the
descendant of the adoptive parent and (2) the court improperly determined that the 63
acres–which Hughes later transferred to Barbara and purchased while serving as trustee of
the Diller Sr. Trust–should remain part of the trust. We disagree.

¶ 36              A. Summary Judgment and the Standard of Review

¶ 37    "Summary judgment is appropriate where the pleadings, depositions, admissions[,] and
affidavits on file, viewed in the light most favorable to the nonmoving party, reveal that there
is no genuine issue as to any material fact and that the moving party is entitled to judgment
as a matter of law." *Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance
Co.*, 227 Ill. 2d 102, 106, 879 N.E.2d 305, 308 (2007). We review *de novo* a trial court's
order granting summary judgment. *Id.*

¶ 38         B. The Claim That the Trial Court Erred Because Illinois Law Presumes
             That an Adopted Child Is the Descendant of the Adoptive Parent

¶ 39    Barbara and her daughters contend that the trial court erred by granting plaintiffs' motion
for summary judgment because Illinois law presumes that an adopted child is the descendant
of the adoptive parent. Specifically, Barbara and her daughters posit that the court erred
because the pre-1997-amendment language of section 2-4(e) of the of the Probate Act of
1975 (Probate Act) (Ill. Rev. Stat. 1985, ch. 110 1/2, ¶ 2-4(e) (now 755 ILCS 5/2-4(e) (West
2010)))–which reflects the idea that an adopted child is treated as if that child were born to
the adoptive parent–establishes a rebuttable presumption that Barbara's daughters should be
treated as if they were Hughes' biological children under the terms of the trusts. Because the
record reveals that Barbara's daughters were "adopted" for the sole purpose of making them
beneficiaries of the trust, we disagree.

¶ 40    In *Cross v. Cross*, 177 Ill. App. 3d 588, 532 N.E.2d 486 (1988), the First District rejected
a defendant's argument that the trial court erred by failing to recognize him as the beneficiary
of a trust in light of the fact that he was adopted at the age of 36 by a 49-year-old decedent,
life-estate beneficiary. Construing the testator's intent, the appellate court concluded that the
language of the trust demonstrated the testator's desire to have her estate remain in her family
unless the family chose to give it to charity. *Cross*, 177 Ill. App. 3d at 590, 532 N.E.2d at
488. The court continued that to allow the life-estate beneficiary to thwart the terms of the
trust by adopting an adult would serve only to disregard the intent of the trust; the court could
not condone such a use of the adoption process. See *Cross*, 177 Ill. App. 3d at 591, 532
N.E.2d at 488-89 ("The adoption of an adult solely for the purpose of making him an heir of
an ancestor under the terms of a testamentary instrument known and in existence at the time
of the adoption is an act of subterfuge.").

¶ 41    Our review of this case reveals that it is strikingly similar to *Cross*. Because we find the

analysis in *Cross* convincing, we adopt it. The trusts in this case, like the trust in *Cross*, clearly demonstrate the testators' intent to have the *res* of the trust remain in the Diller family. To permit Hughes to circumvent the desires of his paternal grandfather and maternal grandmother by "adopting" three grown women–at least one of whom was a grandmother–at the age of 94 would thwart the intent of those trustors. Like the *Cross* court before us, we "cannot condone such a use of the adoption process." *Cross*, 177 Ill. App. 3d at 591, 532 N.E.2d at 489.

¶ 42     Here, Barbara and her daughters, like the defendant in *Cross*, rely on the pre-1997-amendment language of the Probate Act related to adoptees. The court in *Cross* rejected the defendant's reliance on the same language of the pre-1997-amendment language of the Probate Act, as follows:

"Prior to 1955, a presumption existed that adopted children would not inherit property from the lineal or collateral kindred of the adopting parents. [Citation.] Under the present Act, *** the presumption runs in favor of the adoptee. Thus, an adopted child is the 'descendant of the adopting parent for purpose of inheritance from the adopting parent and from the lineal and collateral kindred of the adopting parent.' (Ill. Rev. Stat. 1985, ch. 110 1/2, par. 2-4(a).) That language only applies, however, where a contrary intention is not plainly shown. [Citation.] Here, we have found that the trust plainly shows a contrary intention." *Cross*, 177 Ill. App. 3d at 591-92, 532 N.E.2d at 489.

¶ 43     We note that the amended version of section 2-4(a) of the Probate Act (775 ILCS 5/2-4(a) (West 2010))–prohibiting adult adoptees' inheriting from the lineal or collateral kindred of the adopting parent–applies only to instruments executed on or after January 1, 1998. The law in effect prior to the amendment was as stated in *Cross*, the holding of which was incorporated into section 2-4(a) as amended. Thus, the law both before and after the 1997 amendment is the same.

¶ 44     As part of their argument, Barbara and her daughters cite the First District's decision in *Faville v. Burns*, 2011 IL App (1st) 110335, 960 N.E.2d 99, for the proposition that the court recognized that the subterfuge exception it established in *Cross* was no longer applicable to this type of case because of the limited exceptions the legislature outlined postamendment in section 2-4(f) of the Probate Act. See 755 ILCS 5/2-4(f) (West 2010) ("a child adopted at any time *** is deemed a child born to the adopting parent *** under any instrument executed before September 1, 1955, unless *** [t]he intent to exclude *** is demonstrated by the terms of the instrument"). However, our reading of *Faville* reveals that it did not conclude that *Cross* was wrongly decided. Indeed, the *Faville* court–despite the opportunity–did not reject its previous decision in *Cross*. To the contrary, the *Faville* court pointed out what the parties noted at oral argument in this case, which is that the legislature codified *Cross* when it amended section 2-4 of the Probate Act. In other words, the legislature knew about *Cross* and its limited-use subterfuge exception when the legislature sought to codify it.

¶ 45     Here, the intent clearly demonstrated in the trusts in this case was to have the trust remain in the Diller family, an intent that Hughes thwarted by adopting three of his wife's adult daughters in another state, and we reject any claim that the Probate Act requires a different

result.

¶ 46      In so concluding, we acknowledge (1) the Supreme Court of Illinois's holding in *First National Bank of Chicago v. King*, 165 Ill. 2d 533, 651 N.E.2d 127 (1995), and (2) this court's decision in *In re Estate of Roller*, 377 Ill. App. 3d 572, 880 N.E.2d 549 (2007). Those cases, however, are distinguishable because those cases did not involve subterfuge. See *King*, 165 Ill. 2d at 536, 651 N.E.2d at 129 (issue was whether adopted daughter was a " 'descendant' " within the meaning of the trust, but no allegation of subterfuge); see also *Roller*, 377 Ill. App. 3d at 577, 880 N.E.2d at 554 (issue was whether adopted son could receive greater share of trust than biological children, but no allegation of subterfuge).

¶ 47      C. The Claim That the Trial Court Erred Because It Improperly Determined

That the 63 Acres Should Remain Part of the Diller Sr. Trust

¶ 48      Barbara and her daughters also contend that the trial court erred by granting plaintiffs' motion for summary judgment because the court improperly determined that the 63 acres–which Hughes later transferred to Barbara and purchased while serving as trustee of the Diller Sr. Trust–should remain part of the Diller Sr. Trust. We disagree.

¶ 49      As part of his will, Diller Sr. granted Hughes, as trustee of Franklin Farm Trust, "the authority to purchase additional land adjacent to [the] farm [so] that the land purchased can be operated in connection with [the] farm." In 1992, Hughes purchased a 63-acre tract of land that was directly adjacent to the 1,453-acre Franklin Farm. Hughes thereafter added that tract to the Franklin Farm Trust operation managed by Meurer and noted on his purchase deed that the real estate taxes for that tract should be billed to Bank One, the trust farm manager. The trust farm agreement was later amended by Heartland Ag to cover all the farm acreage (the original 1,453-acre Franklin Farm, plus the newly purchased 63-acre tract). The 2010 Franklin Farm Trust report showed that the trust had been paying real estate taxes on the original acreage as well as the 63-acre tract.

¶ 50      In December 2010, a deed prepared by Barbara's attorney was recorded and purported to transfer the 63-acre tract from the Franklin Farm into a Florida trust of which Barbara was trustee and the primary beneficiary. (The Florida trust left more than 1,000 acres of Hughes' separate farmland to Barbara and her family.)

¶ 51      Barbara and her daughters claim that the December 2010 transfer of the 63-acre tract did not violate Hughes' fiduciary duties as trustee of the Franklin Farm Trust because Diller Sr. "clearly gave [Hughes] the right to title any tract of land in his own name, even if purchased with trust funds, or alternatively, in the name of the trust." Barbara and her daughters point to the following language from Diller Sr.'s will to support their claim:

> "My trustee shall have full power to invest and reinvest the trust estate in such stocks, bonds or other income-producing securities *** or other property in his name individually or in the name of a nominee without qualification or restriction ***."

¶ 52      We need not determine, however, whether this language permits Hughes to violate his fiduciary duties as trustee of the Franklin Farm Trust. See *Dick v. Peoples Mid-Illinois Corp.*, 242 Ill. App. 3d 297, 304, 609 N.E.2d 997, 1002 (1993) ("The creator of the trust can waive

the rule of undivided loyalty by expressly conferring upon the trustee the power to act in a dual capacity, or he can waive the rule by implication where he knowingly places the trustee in a position which might conflict with the interest of the beneficiaries."). Even if it did, the record shows that Hughes purchased the 63 acres in 1992 in his own name on behalf of the trust, not for himself. We find support for our conclusion in this regard in the fact that (1) Hughes noted on the purchase deed for the 63-acre tract that the real estate taxes were to be billed to the trust manager of the Franklin Farm Trust, (2) the Franklin Farm Trust agreement was later amended to include the 63-acre tract, (3) the Franklin Farm Trust paid the taxes on the 63-acre tract, and (4) Hughes did not include the 63-acre tract in his July 2010 revocable trust and only amended the revocable trust in November 2010 after Barbara learned that the 63 acres were titled in Hughes' name.

¶ 53                                   III. CONCLUSION
¶ 54          For the reasons stated, we affirm the trial court's judgment.

¶ 55          Affirmed.