[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-15748

_____

D. C. Docket No. 99-00101-CV-T-25-MAP

BKCY No. 90-10016-8B1

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 07, 2008
THOMAS K. KAHN
CLERK

IN RE:

THE CELOTEX CORP.,

Debtor.

_____

ASBESTOS SETTLEMENT TRUST,

Plaintiff-Appellant,

versus

CONTINENTAL INSURANCE COMPANY,
NATIONAL SURETY CORPORATION,
PATRICK SELWYN PLAISTED,
CERTAIN UNDERWRITERS AT LLOYD'S LONDON,
CERTAIN LONDON MARKET INSURANCE COMPANIES
(Plaisted), et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(July 7, 2008)**

Before EDMONDSON, Chief Judge, PRYOR and KRAVITCH, Circuit Judges.

PER CURIAM:

This is an insurance coverage dispute arising in the context of a decades-long Chapter 11 bankruptcy. The debtor, Celotex Corp., manufactured construction products and building materials containing asbestos, and as such it faced a torrent of lawsuits alleging bodily injury and property damage. As part of its reorganization plan, Celotex created the appellant, Asbestos Settlement Trust. The Trust assumed Celotex's tort liabilities and was assigned Celotex's right to indemnity, if any, under certain excess liability insurance policies. Celotex filed this adversary proceeding seeking a declaration that payment was due under the policies, which the insurers contested.

After a lengthy bench trial, the bankruptcy court determined, as pertinent here, that the policy terms covered claims for both property damage and bodily injury, but that timely notice of claims was not given to the excess insurers. Thus, the bankruptcy judge granted judgment as a matter of law for the nine excess insurers on appeal.[1] The judgment was affirmed on appeal to the district court.

---

[1] Summary judgment was denied as to some insurers, who are not parties to the appeal. This does not defeat our jurisdiction. Although a bankruptcy court order which adjudicates fewer than all claims against all parties to an adversary proceeding is typically not final, it becomes so if the court directs separate entry of judgment pursuant to Fed. R. Bankr. P. 7054, which incorporates Fed. R. Civ. P. 54(b). See In re FDR Hickory House, 60 F.3d 724, 725 (11th Cir. 1995). Here, the bankruptcy court directed entry of judgment pursuant to Fed. R. Bankr. P. 7054, rendering its judgment appealable as to the claims and parties certified. Further, the

The only issue before us is whether notice was timely given to the excess insurers about the property-damage claims. We agree with the bankruptcy and district courts that it was not.

**I.**

The pertinent facts are undisputed, except as noted.

*A. Celotex's Excess Policies*

Celotex was a sophisticated insured and an experienced defendant in mass tort cases. It began facing large numbers of asbestos-related bodily-injury suits in the 1970s. Because of these suits, Celotex (with its parent company) had an insurance department and in-house legal team which attempted to manage its liability exposure. Celotex bought multiple layers of insurance coverage to manage its risks.

At all pertinent times, Celotex had multiple layers of liability insurance coverage: primary policies with Aetna, but also umbrella (second layer) and excess (third and higher layers) policies with numerous insurers. Only the excess policies from 1978 to 1984 are at issue here. The policies were renewed annually. The umbrella policies provided coverage for liability beyond the primary policy's

district court finally adjudicated all the claims properly before it on appeal, so we see no need for a separate Fed. R. Civ. P. 54(b) certification by the district court. See id. at 725 n.1 (where a district court affirms a bankruptcy court order, both orders necessarily possess the same degree of finality).

3

limits, while each excess policy in turn provided coverage for liability exceeding the limits of the policy immediately underlying it, and so forth. The umbrella and excess policies "followed form" to the underlying primary policy; that is, the scope of insured risks was identical, except insofar as the excess policies expressly provided otherwise. The primary policies had separate coverage limits for bodily injury and property damage; $2 million of coverage was available yearly for the property damage claims. The umbrella and excess policies, however, had an aggregate coverage limit for bodily injury and property damage; in other words, paying claims of one category diminished the coverage available for the other.

During 1978-1984, Celotex's primary policies excluded coverage for asbestos-related bodily-injury claims.[2] This was important because it meant that massive amounts of bodily-injury claims and settlements were being paid out of higher layers of coverage, not the primary coverage. Moreover, because the second and higher layer policies had single coverage limits encompassing both bodily-injury and property-damage claims, any property-damage claims were more likely to impact the upper-layer excess carriers than they would have been in the absence of the exclusions in the primary policies, as any payments on bodily-injury claims would consume the lower levels of excess coverage. Between 1978 and

---

[2] It appears the primary policies did provide coverage for bodily-injury claims unrelated to asbestos.

4

1982, the excess policies had exclusions for "asbestosis," although beginning in April 1983 Celotex took the position that there was still excess coverage for some bodily-injury claims.[3]  Between 1982 and 1984, the exclusion language in the excess policies was even broader, excluding coverage for asbestosis "and related diseases arising out of asbestos products."

The excess policies required written notice to the insurers "as soon as practicable" in the event of an "occurrence" "reasonably likely" to implicate coverage.  They also required notice of "any claim made on account of such occurrence" and required legal papers to be forwarded to the insurer.  Although not all the policies used precisely this language in their notice provisions, the language was substantially similar in each policy, and the lower courts treated the notice obligations under each policy as identical.  No one contends otherwise here.

*B. The Property Damage Litigation*

Before the initial wave of bodily-injury suits against asbestos manufacturers in the 1970s had subsided, a second wave of property-damage suits appeared on the horizon.  Such suits were foreseen by Celotex, which anticipated an

---

[3] The focus of the coverage dispute over bodily-injury claims was whether "asbestosis" was one discrete disease or a term the parties used to refer generically to all symptoms and diseases resulting from asbestos exposure.  The bankruptcy court chose the former interpretation.

"explosion" of property-damage litigation similar to the then-familiar bodily-injury cases. Asbestos-related property-damage suits were encouraged by the federal government. In 1979, the EPA published a document called the Orange Book which provided guidance to owners of buildings containing asbestos. The Orange Book advised building owners that any exposure to asbestos, even in small amounts, could be carcinogenic, and that owners should remove asbestos from their buildings. Congress passed legislation in 1980 which obligated school districts to look for asbestos in their buildings, assisted them in doing so, and assisted them in mitigating hazardous conditions resulting from asbestos exposure. See generally 20 U.S.C. § 3601 et seq. The first asbestos-related property-damage suits were filed in 1980, but Celotex was not a party. In 1981, pursuant to federal statutory requirements, the Attorney General issued a report on the state of asbestos litigation which was essentially a blueprint for school boards to sue asbestos manufacturers; the report included a model complaint and specifically named Celotex as a potential defendant.

The first asbestos-related property-damage suit naming Celotex was filed in 1981, and more soon followed. In June 1982, the first of five class action suits seeking damages for asbestos-related property damage was filed against Celotex. The other four suits included a case filed January 1983 involving 4,000 buildings.

Altogether, the pre-1985 property-damage suits against Celotex sought about $2 billion in damages. Nonetheless, Celotex did not notify its excess insurers of these suits as the pleadings were received.

Celotex and Aetna did not pay anything on an asbestos-related property-damage claim, whether by judgment or settlement, until 1986. From 1986 to 1988, Aetna, the primary insurer, paid only $785,000 in property-damage claims. Further, these payments were well within the limits of property-damage coverage under the primary policies, so no indemnity was due from the umbrella and excess policies.

When Celotex filed for bankruptcy in 1990, it still had remaining property-damage coverage under the primary policies;[4] no excess carriers had yet been impacted. Celotex initiated this declaratory judgment proceeding to determine its rights under the policies. Approximately $20 billion in proofs of claim were filed against Celotex alleging property damage from its asbestos products. Its ultimate liability for property damage is not yet known, but Celotex estimates it will be on the order of billions of dollars.

*C. Notice or the Lack Thereof*

---

[4] The Trust contends it had about $6.6 million remaining in primary coverage for property-damage claims; the insurers contend the amount was closer to $2.2 million. Nothing turns on the distinction, which is insignificant in the larger picture of asbestos litigation.

7

On December 5, 1979, Aetna issued a reservation of rights letter to Celotex concerning all asbestos-related bodily-injury claims. Aetna also recommended that the umbrella and excess carriers be informed of its position. Rollins Burdick Hunter (RBH), Celotex's insurance broker, forwarded copies of the letter to the umbrella and excess carriers in late 1979. At first, notice was given only to pre-1977 carriers, not to the appellees here. On January 2, 1980, Robert Emerton, Celotex's in-house insurance counsel, decided to expand the scope of notice. Emerton wrote a letter instructing RBH to notify Celotex's umbrella and excess carriers of all pending asbestos related cases, stating it "appears likely that all our excess carriers may be involved in our asbestos-related litigation." In that same letter Emerton issued the following critical instruction to RBH: "On all future cases I would ask [RBH] to notify not only our first layer excess carriers, but all excess carriers which would have coverage applicable to asbestos-related claims." At trial, a Celotex employee confirmed that this instruction was intended to apply, going forward, to both bodily-injury claims and property-damage claims. The latter were unfiled, but eminently foreseeable, when the letter issued.

There is some dispute between the parties as to whether and when notice of property-damage claims was given. The bankruptcy court found that, despite Celotex's instruction to RBH, notice had not been given to any of the excess

8

insurers of any property-damage claims until after Celotex's bankruptcy filing in 1990. The district court stated that notice was given beginning in 1984 and periodically thereafter. It did not state, however, that it was disturbing any factual finding by the bankruptcy court, and was apparently unaware of the inconsistency. The inconsistency probably is best explained by the fact that the Trust offered some documents which purported to show contemporaneous notice of the property-damage suits, but they were received by the bankruptcy court for a limited (and different) purpose.[5] We will adhere to the bankruptcy court's finding that notice was not given contemporaneously as the property-damage suits were filed, as underwriting presentations by Celotex to the excess insurers were conducted, or as the excess policies were entered into, as the Trust's argument to the contrary was based on documents admitted only for another purpose.

In any event, the bankruptcy court concluded that a reasonable insured would have given notice of the property-damage claims in April 1983 at the latest. When Celotex filed for bankruptcy in 1990, it had paid $6.95 million in settlements and judgments on property-damage claims, and had, at most, approximately $6.6

---

[5] The Trust raises no argument on appeal to this court that the limited-purpose admission was erroneous, so the issue is forfeited. Likewise, the Trust argued on appeal to the district court that the bankruptcy court erred in excluding altogether certain documents which purported to show notice, a contention which the district court rejected and which was not argued on appeal here.

million in primary property-damage coverage remaining.

## II.

The parties agree that Illinois law governs this dispute. Under Illinois law, whether notice was timely given under particular circumstances is a question of law subject to plenary review. See Hartford Accident & Indemnity Co. v. Rush Presbyterian St Luke's Med. Ctr., 595 N.E.2d 1311, 1316 (Ill. App. 1992) (citations omitted).

Where a policy requires notice to an insurer of a claim or occurrence, timely notice is a condition precedent to coverage. However, notice requirements in excess policies are interpreted differently from their counterparts in primary policies, because excess insurers often do not investigate occurrences nor defend the insured. Id. at 1315 (citation omitted). Accordingly, the insured typically has some discretion in notifying an excess insurer of a claim or occurrence. Id. The policy language here required notice "as soon as practicable" in the event of an occurrence "reasonably likely" to implicate coverage, terms which convey that the insured retains some discretion in providing notice. As the policy language implies, notice is not necessarily due immediately upon learning of a claim or occurrence, or when it is merely possible that the excess coverage would be implicated, but only once a reasonable insured would realize that it was

10

"reasonably likely" the excess coverage could be impacted by an occurrence or claim. See id. at 1315, 1317. When an insured has primary coverage available and could not foresee that an excess policy would be implicated, notice is not due. Zurich Ins. Co. v. Walsh Constr. Co., 816 N.E.2d 801, 806-07 (Ill. App. 2004). In other words, the critical question is when "should [the insured] reasonably have known that its excess insurance coverage would be implicated?" Atlanta Int'l Ins. Co. v. Checker Taxi Co., 574 N.E.2d 22, 25 (Ill. App. 1991).

Although we must look to the totality of the circumstances in determining whether a reasonable insured would have known an excess insurer would be impacted, several particular circumstances are especially relevant. The first is the amount of damages sought by the property-damage suits. Notice is not necessarily due just because a complaint seeks damages in excess of the remaining primary coverage. Hartford, 595 N.E.2d at 1316-17 (rejecting a bright-line rule requiring notice to excess carriers upon receipt of a complaint seeking damages in excess of primary coverage). But although not determinative of whether notice is due to an excess insurer, the amount of damages sought in a complaint is relevant. Ad damnum clauses which dwarf the primary coverage are, as the bankruptcy court noted, cause for concern and militate in favor of providing notice.

Of course, a reasonable insured may undertake a diligent investigation of a

11

claim or occurrence and conclude that it will not implicate an excess policy, notwithstanding a prayer for relief which would do so on its face. In those circumstances, the insured acts reasonably by withholding notice. In other words, the insured's own reasonable evaluation of the merits of any suit or demand is highly relevant to whether notice was timely given. See Hartford, 595 N.E. 2d at 1317. The sophistication of the insured is also relevant in determining whether notice was timely given. Country Mut. Ins. Co. v. Livorsi Marine, Inc., 856 N.E.2d 338, 344 (Ill. 2006). An insurer need not show prejudice to prevail on an untimely notice defense, but the presence or absence of prejudice is relevant to whether notice was reasonably given in the circumstances. Id. at 346.

Importantly, an insured may not withhold notice that the excess carriers will be impacted simply because it might take a while for such an impact to be felt. An insured who has reason to believe excess carriers will be impacted in the future must give notice when it reaches that understanding; it cannot wait until the underlying coverage is about to run out. See Sisters of Divine Providence v. Interstate Fire & Cas. Co., 453 N.E.2d 36, 38 (Ill. App. 1983); see also Hartford, 595 N.E.2d at 1316 ("The insured must show that notice was given when it concluded that the excess insurance policy was implicated... .").

The Trust argues that notice of the property-damage claims was not due to

12

the excess insurers even in 1990, let alone in April 1983 as the bankruptcy court held, because there was still property-damage coverage available under the primary policies in 1990. We disagree. Celotex determined in 1980 that all future asbestos litigation, including property-damage litigation, could well impact the excess carriers. That is why, in 1980, it directed notice of all future asbestos litigation be given to its excess insurers. When an insured actually (and quite reasonably) concludes all future claims will impact excess coverage, it is *a fortiori* unreasonable to withhold notice of claims for years after the complaints are received. Yet that is what happened here. Inexplicably, RBH did not provide notice despite instructions from Celotex to do so. Nor did Celotex provide notice itself or verify that its agent was performing according to instruction. Celotex argues that the 1980 conclusion that future suits would affect the excess insurers only concerned bodily-injury suits, but there was credible testimony to the contrary.

Moreover, the nationwide scope of asbestos property-damage litigation, as well as the massive damages sought in the property-damage actions, suggests the excess insurers should have been notified long before Celotex's bankruptcy. These suits sought damages in the billions of dollars, while the primary coverage which the Trust relies upon to justify its lack of notice had, at most, $6.6 million in

13

primary coverage remaining. Even if the ad damnum clauses were grossly overstated, as Celotex argues, the cases needed only to settle for a minuscule fraction of their purported value to exceed the primary coverage. Or, after one or two breakthrough verdicts or settlements, the excess insurers would be implicated.[6] Obviously, an insured need not be so conservative as to assume that every case is worth the plaintiff's demand. But neither can a reasonable, prudent insured optimistically assume that damage claims exceeding its primary coverage by multiples of several hundred will not implicate excess policies, particularly when one litigation defeat could exhaust the primary policy. Celotex could fall back on its own reasonable diligence or claims evaluation process had it rationally concluded that property-damage liability exceeding the primary coverage was unlikely, notwithstanding the huge ad damnum clauses. But the bankruptcy court found no evidence that any such process or diligence occurred – a factual finding the insurers have not challenged. Celotex's failure to give notice was apparently the result of oversight or negligence, not a meticulous evaluation of the suits' merits.

The Trust argues that because the early property-damage suits were being dismissed or settling for minuscule amounts, notice was not due before 1990. But

---

[6] The insurers point us to a representative case, concerning a Federal Reserve Building, that settled for $5.5 million.

14

that does not alter the fact that Celotex foresaw a decade earlier that its excess insurers would be impacted by the overall course of the property-damage litigation. The insured's own knowledge that excess insurers would be implicated is more important than the pace of litigation or settlement, as "[t]he insured must show that notice was given when it concluded that the excess insurance policy was implicated... ." Hartford, 595 N.E.2d at 1316. And Celotex's 1980 realization was correct; although it took years to exhaust the primary Aetna coverage, that coverage ultimately will not be sufficient to cover Celotex's eventual property-damage liability.

Moreover, the bankruptcy court was correct that Celotex's April 1983 "epiphany" is highly relevant to the reasonableness of notice practices concerning the property-damage claims. It was then that Celotex, for the first time, took the position that there was excess coverage for bodily-injury claims other than "asbestosis." If this interpretation of the excess policies was correct, a reasonable, sophisticated insured would have realized at that time that property-damage claims could well affect the higher-level excess insurers, because of (i) the volume and amount of bodily-injury claims, and (ii) the aggregate coverage limits for bodily-injury and property-damage claims, resulting in consumption of lower-level excess coverage by bodily-injury suits.

15

In sum, Celotex concluded in 1980 that all future asbestos litigation could impact its excess coverage. It foresaw a massive wave of property-damage litigation, which materialized. It was sued for over $2 billion dollars in property damage, as against less than $7 million in primary coverage. It produced no evidence that a rational claims evaluation process led it to alter its 1980 determination that notice of suits should be given going forward, or to conclude that its primary coverage would last in the long run. And it gave no notice until at least five years, and in some cases almost a decade, after the property-damage suits were filed. As the bankruptcy and district courts recognized, such neglect was unreasonable in the circumstances.

**AFFIRMED.**