67 A.3d 587

IN THE MATTER OF THE LIQUIDATION OF INTEGRITY INSURANCE COMPANY/THE CELOTEX ASBESTOS TRUST.

Argued January 15, 2013—Decided June 19, 2013.

See also 299 Fed.Appx. 850.

*David M. Freeman,* argued the cause for appellant Thomas B. Considine, Commissioner of Banking and Insurance of the State of New Jersey in his capacity as Liquidator of Integrity Insurance

Company (*Mazie Slater Katz & Freeman,* attorneys; *Mr. Freeman* and *John D. Gagnon,* on the brief).

*James R. Matthews,* a member of the Ohio bar, argued the cause for respondent The Celotex Asbestos Settlement Trust (*Saiber,* attorneys; *Marc E. Wolin,* on the brief).

Judge CUFF (temporarily assigned) delivered the opinion of the Court.

This appeal concerns excess comprehensive general liability insurance issued by a now-insolvent insurance company to a business that used asbestos in many products it designed, manufactured, and distributed and to a subsidiary corporation that mined the fiber. The insureds sought bankruptcy protection in 1990 and, in 1991, commenced a declaratory judgment action seeking coverage from the many insurers that had issued layers of insurance over the years. Relevant to this appeal, a bankruptcy judge found that the insured corporations had failed to provide timely notice to their excess insurers and barred coverage.

In 2009,[1] proofs of claim were submitted to the Liquidator of the insolvent excess carrier. Both claims were rejected by the Liquidator, a special master, and a trial judge. All relied on the order entered in the prior declaratory judgment action. An Appellate Division panel reversed; this Court granted leave to appeal.

This appeal involves the application of collateral estoppel. Determining whether collateral estoppel applies to the 2009 claims requires a review of the circumstances that precipitated the bankruptcy filing, the insureds' management of their insurance program, and the declaratory judgment proceedings commenced by the insureds regarding their insurance coverage. The result of the review leads to the inexorable conclusion that the claims under review are barred.

---

[1] The 2009 proofs of claim fully incorporated two proofs of claim filed in 2004.

## I.

Celotex Corporation (Celotex) was a major manufacturer of commercial and residential building and roofing products. Carey Canada Inc. (Carey Canada), a subsidiary of Celotex, was a miner of raw chrysotile asbestos fibers, which Celotex used in various products. In the late 1970s and early 1980s, Celotex[2] hired Rollins Burdick Hunter (RBH) as its insurance broker. RBH managed negotiations, contracts, claims, and other related transactions concerning Celotex's liability insurance policies. *Celotex Corp. v. AIU Ins. Co. (In re Celotex )*, 194 *B.R.* 668, 673 (Bankr. M.D.Fla.1996).

In the late 1970s and early 1980s, thousands of lawsuits were filed throughout the country asserting liability against Celotex for bodily injuries and property damage incurred from its asbestos-related products.[3] In October 1990, Celotex filed for reorganization under Chapter 11 of the Bankruptcy Code. 11 *U.S.C.A.* §§ 1101–1174. In due course, on February 1, 1998, the bankruptcy court approved the establishment of the Celotex Asbestos Settlement Trust (Trust) to process all of the asbestos-related claims. The Trust assumed Celotex's tort liabilities and received an assignment of Celotex's right to indemnity under various excess insurance policies.

Integrity Insurance Company (Integrity) issued an annual excess insurance policy to Jim Walter Corp., the parent corporation of Celotex, effective October 1, 1982 through October 1, 1983, and renewed this policy, effective October 1, 1983 through October 1, 1984. Each policy provided $5 million of excess comprehensive general liability coverage. On December 30, 1986, the Superior Court of New Jersey declared Integrity insolvent, and on March

---

[2] In this opinion, Celotex refers to Celotex Corp. and Carey Canada.

[3] In all, 22,490 asbestos-related claims were filed against Celotex between October 1, 1977 and April 12, 1983. *Celotex Corp. v. AIU Ins. Co. (In re Celotex )*, 216 *B.R.* 867, 875 (Bankr.M.D.Fla.1997).

25, 1987, the court entered an Order of Liquidation. The parties to this appeal are the Liquidator of Integrity and the Trust.

The Integrity policies required Celotex to provide notice "as soon as practicable" of an "occurrence" that appeared likely to result in a claim for excess insurance coverage. The notice of loss provisions in each policy stated: "The Insured shall immediately advise the Company of any accident or occurrence which appears likely to result in liability under this Policy and of subsequent developments likely to affect the Company's liability hereunder." The Integrity policies did not define the term "occurrence," but the policies adhered to the International Insurance Company umbrella policies under which "occurrence" was defined as

> either an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and [un]intentionally causes injury to persons or tangible property during the policy period. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.
>
> [*Celotex Corp. v. AIU Ins. Co. (In re Celotex*), 196 *B.R.* 973, 1020 (Bankr.M.D.Fla. 1996) (emphasis omitted).]

In 1978, insurance policies uniformly excluded asbestosis claims. In December 1979, Aetna, the primary liability insurer of Celotex, "strongly recommended" to its insureds manufacturing and distributing asbestos-containing building materials to provide notice to umbrella and excess insurers of the pending lawsuits. Aetna had acted in response to "The Orange Book" published by the Environmental Protection Agency earlier in 1979 that provided advice to building owners about asbestos-containing building products. It is undisputed that by December 1979 Celotex had given notice only to its pre-October 1978 insurance providers.

In response to Aetna's advice, Celotex's in-house insurance counsel wrote to RBH explaining a plan to expand the scope of notice. The letter stated that it "appears likely that all our excess carriers may be involved in our asbestos-related litigation." Celotex instructed RBH "[o]n all future cases ... to notify not only our first layer excess carriers, but all excess carriers which would have coverage applicable to asbestos-related claims." Notwith-

standing that directive, Celotex's excess carriers did not receive notice at that time. In April 1983, Celotex provided notice to its pre–1982 insurance carriers. Post–1982 insurance providers received notice of claims no earlier than 1985, if then.

In 1980, Congress enacted the Asbestos School Hazardous Detection and Control Act of 1980 (ASHDCA), Pub.L. No. 96–270, 94 Stat. 487 (codified as amended at 20 *U.S.C.A.* §§ 3601–3611). Pursuant to Section 8(b) of ASHDCA, the Attorney General issued a report to Congress explicitly identifying Celotex as a potential target of lawsuits. The report included a model complaint to assist school boards in commencing litigation. Soon thereafter, the number of lawsuits for asbestos-related claims increased.

In October 1990, Celotex sought reorganization through bankruptcy. It filed an adversary proceeding in which it sought a declaratory judgment that it was entitled to coverage for asbestos-related bodily injury and property damage claims from multiple layers of primary, umbrella, and excess coverage issued by multiple insurers over the years. The bankruptcy court severed the proceeding into four phases. *In re Celotex Corp., supra,* 196 *B.R.* at 976. Phases I and IV are relevant to this appeal.

During Phase I, the bankruptcy court determined that Illinois law applied to the coverage dispute. *In re Celotex Corp., supra,* 194 *B.R.* at 671. In reaching that determination, the court conducted a choice-of-law analysis, ultimately concluding that Illinois law governed the post–1977 insurance policies at issue. *Id.* at 671–77.

During the same phase, the bankruptcy court interpreted the term "occurrence" in accordance with Illinois law in the context of eight representative asbestos-related property damage cases. *In re Celotex Corp., supra,* 196 *B.R.* at 978–79, 1006–16. Relying primarily on *Zurich Insurance Co. v. Raymark Industries, Inc.,* 118 *Ill.*2d 23, 112 *Ill.Dec.* 684, 514 *N.E.*2d 150 (1987) and *United States Gypsum Co. v. Admiral Insurance Co.,* 268 *Ill.App.*3d 598, 205 *Ill.Dec.* 619, 643 *N.E.*2d 1226 (1994), *appeal denied,* 161 *Ill.*2d 542, 208 *Ill.Dec.* 370, 649 *N.E.*2d 426 (1995), the judge determined

that Illinois follows the equitable continuous trigger doctrine. *See In re Celotex Corp., supra,* 196 *B.R.* at 1010–15. In the case of asbestos-related bodily injury claims, an insurer is required to provide coverage of a claim if its policy was in effect during the time of exposure to the asbestos fiber or asbestos-containing material, when the asbestos-related condition has yet to cause impairment but produces a weakening of a bodily system or function, or when the asbestos-related disease is finally capable of detection or diagnosis. *Id.* at 1011 (citing *Zurich, supra,* 112 *Ill.Dec.* 684, 514 *N.E.*2d at 161). In the case of asbestos-related property damage claims, an insurer is required to provide coverage of a claim from when the asbestos-containing material or product was installed in a building—if its policy was in effect at that time—through release or threatened release of asbestos fiber due to deterioration, normal maintenance or renovation activities, removal, or containment. *Id.* at 1013–15, 112 *Ill.Dec.* 684, 514 *N.E.*2d 150. Each installation of asbestos-containing building materials is not, however, a separate occurrence, because the insured's liability is predicated on its manufacture and distribution of products rather than installation or incorporation of its products in a building. *U.S. Gypsum, supra,* 205 *Ill.Dec.* 619, 643 *N.E.*2d at 1258–60.

In Phase IV, the bankruptcy court divided the policies by date of issuance and types of coverage and discussed the issue of whether Celotex provided timely notice of occurrence in four subsections: (1) bodily injury excess carriers between October 1978 and 1982; (2) bodily injury excess carriers between October 1982 and 1984; (3) property damage excess carriers between October 1978 and 1982; and (4) property damage excess carriers between October 1982 and 1984. *See In re Celotex Corp., supra,* 216 *B.R.* at 878–81. The second and fourth subsections are relevant for purposes of this appeal.

The bankruptcy court concluded that Celotex should have provided notice in April 1983 to bodily injury excess insurers whose

policies were in effect from 1982 to 1984. *Id.* at 880. Specifically, the bankruptcy court stated:

> [I]t is this [c]ourt's opinion, in light of the notice in April 1983 to the pre–1982 excess carriers, coupled with [Celotex's] lawsuit in the District of Columbia on excess coverage for asbestos-related diseases, that [Celotex] at the latest had to believe [its] post–1982 excess policies . . . would be impacted.
>
> If [Celotex] believed its initial epiphany of coverage was correct as to giving notice in April 1983 to the pre–1982 carriers, [Celotex] also had to reasonably believe [that] its conclusion was applicable to the post–1982 excess insurance carriers and would be required for the 1982–1984 policies.
>
> [*Ibid.*]

After concluding that Celotex should have provided notice in April 1983, the bankruptcy court determined that "there is no clear perception when notice was [actually] given to the post–1982 excess carriers as to asbestos bodily injury claims." *Ibid.* The court stated that "notice, if given at all, was not provided until 1985 at the earliest." *Id.* at 882. In sum, Celotex's duty to give notice arose in April 1983. *Id.* at 880. "Any notice thereafter of asbestos bodily injury claims was unreasonable." *Ibid.*

Next, for the property damage claims, the bankruptcy court found "no evidence to establish reasonable notice to excess insurance carriers. . . ." *Id.* at 881. Looking specifically at the property damage excess insurance carriers from 1982 to 1984, the bankruptcy court determined that Celotex "had cause to believe that . . . the asbestos building claims would impact . . . *all* excess insurance," and thus should have provided notice in April 1983. *Id.* at 882 (emphasis added). The court then stated that "[i]ncredibly, it appears that only later-maybe post–1990 . . . [Celotex] figured out that notice had to be given." *Id.* at 880–81. In sum, the bankruptcy court concluded that "[t]he notice was untimely and unreasonable in light of [Celotex's] sophistication, the unexplained long delays, and [Celotex's] settlement of claims without insurance carrier participation." *Id.* at 882. Because the required notice was not provided, Celotex was barred from obtaining coverage under the relevant policies. *Id.* at 882–83.

The Trust filed an appeal in the United States District Court for the Middle District of Florida. The district court similarly deter-

mined that, as a matter of law, Celotex's duty to give notice to post-1982 excess insurers for both property damage and bodily injury claims arose well before it actually provided notice. The Trust sought review in the Court of Appeals for the Eleventh Circuit. *Asbestos Settlement Trust v. Cont'l Ins. Co. (In re Celotex Corp.)*, 299 *Fed.Appx.* 850 (11th Cir.2008). The court focused its review of the district court decision on "whether notice was timely given to the excess insurers about the property-damage claims," because the bodily injury claims were not before it. *Id.* at 851.

The circuit court noted that Celotex was not only a sophisticated insured but also an experienced mass-tort defendant. *Ibid.* After reciting the various factors on which both the bankruptcy court and the district court relied, the court rejected the Trust's assertion that notice was not required until the primary and umbrella policies were exhausted. *Id.* at 853–55. The court remarked:

> Importantly, an insured may not withhold notice that the excess carriers will be impacted simply because it might take a while for such an impact to be felt. An insured who has reason to believe excess carriers will be impacted in the future must give notice when it reaches that understanding; it cannot wait until the underlying coverage is about to run out.
>
> [*Id.* at 855.]

The circuit court also specifically rejected the Trust's argument that it had not been required to provide notice to its excess insurers of property damage claims because it had yet to exhaust its primary coverage even in 1990. *Id.* at 856. The court highlighted the insured's knowledge in 1980 that all future asbestos litigation could well impact the excess carriers. *Ibid.* Thus, notice was due at that time. *Ibid.* In sum, the court affirmed the finding that Celotex knew a decade before it gave notice that the bodily injury and property damage claims already filed and reasonably anticipated to be filed would reach its excess coverage. *See ibid.* In doing so, the court also affirmed the legal conclusions that notice of those claims was due at that time, that Celotex acted unreasonably when it withheld notice, and that it, therefore, was not entitled to recover under the policies. *Ibid.*

## II.

The current litigation arises in the context of the liquidation of Integrity's assets. On December 31, 2004, and again on September 25, 2009, the Trust filed two proofs of claim with the Integrity Liquidator. Each sought the face amount of the 1982–1983 and 1983–1984 policies, $5 million each, for bodily injury and property damage claims arising from exposure to asbestos and asbestos-containing materials. The Trust stated it had continued to allow claims for non-excluded bodily injury and property damage. Through a Notice of Determination, the Liquidator denied the Trust's claims. The Deputy Liquidator stated "the 11th Circuit Court of Appeals confirmed the Florida Bankruptcy Court's decision which dismissed all excess carriers from the insured's coverage litigation due to late notice." Accordingly, the Liquidator concluded the Trust was not entitled to any proceeds from the Integrity policies. The Trust submitted formal objection to the Notice of Determination. The Liquidator declined to amend its determination, and Integrity requested a hearing before the court-appointed special master.

The special master first noted that the bankruptcy court in the Middle District of Florida granted the excess insurers' motions to dismiss "on the grounds that Celotex failed to give the insurers timely notice of the claims as required by the policies." He rejected the contention that the Florida decisions only applied to claims made at the time Celotex filed for bankruptcy. He explained that the Florida cases "conclusively determined that the duty to notify the excess carrier of an occurrence or an accident as relates to an asbestos bodily injury or damage to property is a prerequisite to coverage." After recounting the facts set forth in the Florida opinions, the special master concluded that those decisions make "clear that Celotex failed to give timely notice ... of the occurrences which gave rise to any and all of its asbestos claims which would implicate and impact the excess coverage layers...." In sum, the special master interpreted the Florida cases as having found a breach of the insurance policies and a

resulting bar from coverage "for any and all claims." As such, the special master denied the Trust's motion.

The Trust filed a motion in the Superior Court to set aside the special master's determination. The Law Division judge confirmed the special master's decision. The judge stated the special master's "thorough and well reasoned opinion" correctly concluded that Celotex failed to satisfy a prerequisite to coverage.

The Appellate Division reversed, finding the Florida decisions did not preclude the Trust's current claims. According to the Appellate Division panel, the issue before the bankruptcy court was whether Celotex had provided reasonable notice of the then-pending claims. The panel explained that the bankruptcy court's decision "did not address future claims, nor could it do so, because it lacked any factual basis on which to opine whether notice with respect to those prospective claims had been reasonably provided or not."

In examining the definition of "occurrence" in the underlying umbrella policy, the Appellate Division panel stated notice was required when an occurrence took place. The court then concluded that "[s]ince the occurrences for which the Trust now seeks payment were not known at the time of the Celotex bankruptcy, there could have been no duty to provide reasonable notice." The panel found the bankruptcy court could not have considered the claims forming the basis of the current dispute because "no claim, premised on the happening of an occurrence, had been filed." Thus, Celotex's duty to provide notice had not yet been triggered. In sum, "the issue of the adequacy of notice, determined in connection with earlier claims in the adversary proceeding, cannot be found to be dispositive of the issue of the adequacy of notice with respect to later-arising claims." According to the appellate panel, the Florida cases addressed the former and the current litigation addresses the latter. We granted the Liquidator's motion for leave to appeal.

### III.

A. Liquidator's Arguments.

The Liquidator contends the doctrine of collateral estoppel bars the Trust from seeking coverage under the Integrity policies because the Florida courts already determined that Celotex breached its obligation to provide timely notice and, consequently, the excess insurers have no obligation to provide coverage. According to the Liquidator, the Appellate Division erred by misinterpreting the express definition of "occurrence" provided in the umbrella policy and by misinterpreting the controlling law.

The Liquidator contends Illinois law, specifically *Uhlich Children's Advantage Network v. National Union Fire Co.*, 398 *Ill.App.*3d 710, 340 *Ill.Dec.* 880, 929 *N.E.*2d 531, 537 (internal quotation marks omitted), *appeal denied,* 236 *Ill.*2d 574, 342 *Ill.Dec.* 576, 932 *N.E.*2d 1037 (2010), defines an "occurrence" as any "negligent or other liability-causing act or omission that occurs during the policy period regardless of when a legal claim arising out of the act or omission is made against the insured." Applying that definition, the Liquidator asserts the "occurrence" for which notice was required was "Celotex's sale, installation, failure to remove, etc., of the asbestos-containing products during the policy period...." Thus, while the claims at issue in the Florida case were different than the claims at issue in the present case, they all result from the same "occurrence," and the scope of the Florida decisions pertained to inadequate notice of occurrence, not inadequate notice of particular claims.

The Liquidator contends that, had the Florida courts intended to limit the scope of their decisions to only those claims then pending, "they clearly would have stated" so. Rather, the Liquidator contends, they "clearly barred coverage for all claims," including those that would be filed in the future. According to the Liquidator, that interpretation finds support in the fact that the Florida decisions barred coverage for claims filed after 1985, when Celotex provided notice. If the Florida courts were referring to

notice of individual claims, then the claims filed post–1985, but pre-bankruptcy filing, would have been premised upon sufficient notice. Consequently, because the Florida decisions unquestionably applied to those claims filed after Celotex provided notice, which were pending at the time of the Chapter 11 bankruptcy filing, they must reach all future claims as well.

### B. The Trust's Arguments.

The Trust asserts the Florida litigation does not bar access to the Integrity excess policies. It contends the first two elements of collateral estoppel are not satisfied. Specifically, the Trust argues "(1) the issue in the current litigation is not identical to the issue in the Florida decisions, and (2) the Florida cases did not actually litigate whether notice was proper for the post-bankruptcy claims."

The Trust contends the Florida cases "did not purport to resolve whether insurance coverage existed for lawsuits that would not be filed until years and decades later." More generally, the Trust argues collateral estoppel cannot apply to fact-specific situations that develop after the initial proceedings. In support of that proposition, the Trust cites several cases in which appellate courts reversed dismissals based on res judicata or collateral estoppel. *See, e.g., Lawlor v. Nat'l Screen Serv. Corp.,* 349 *U.S.* 322, 328, 75 *S.Ct.* 865, 868, 99 *L.Ed.* 1122, 1127–28 (1955) ("While the 1943 judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect [under the res-judicata doctrine] of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case.").

The Trust also argues there are multiple occurrences. The Trust asserts "[i]t is undisputed ... that each claim involves different people with different injuries that accrued at ... different times due to exposure to different asbestos products and operations that were used and performed at different properties in different states." Because the present claims involve different

claimants, the Trust contends the Florida declaratory judgment has no bearing. In other words, each claim is a separate occurrence.

The Trust further asserts the policy language supports that interpretation of "occurrence." The policies required Celotex to provide notice of "accidents," "occurrences," and "subsequent developments." Based on that language, the Trust contends it would "make[ ] no sense" if there was just one notice obligation when the excess policy is implicated.

Next, the Trust asserts the language in the Florida opinions contradicts the Liquidator's position. Specifically, the Trust points to the language setting forth the issue in both the Phase IV bankruptcy court decision and the circuit court decision. The bankruptcy court referred to "asbestos bodily injury and property damage claims," *In re Celotex Corp., supra,* 216 *B.R.* at 870, while the court of appeals referred to "property damage claims," *In re Celotex Corp., supra,* 299 *Fed.Appx.* at 851. Accordingly, the Trust argues that the Florida opinions explicitly acknowledge their limited scope by framing the issue as a case-by-case notice determination. The Trust also notes that, even if this Court finds that the Liquidator's interpretation is a feasible one, any ambiguities in the Integrity policy must be construed in favor of Celotex.

Finally, the Trust argues the collateral estoppel doctrine should not be applied when doing so would produce an unfair result. The Trust contends fairness concerns weigh in favor of the Trust to permit compensation to those who incurred asbestos-related injuries.

## IV.

"As a general principle, '[c]ollateral estoppel is that branch of ... res judicata which bars relitigation of any issue which was actually determined in a prior action, generally between the same parties, involving a different claim or cause of action.'" *Div. of Youth & Family Servs. v. R.D.,* 207 *N.J.* 88, 114, 23 *A.*3d 352 (2011) (quoting *State v. Gonzalez,* 75 *N.J.* 181, 186, 380 *A.*2d

1128 (1977)). When the prior action is the subject of a prior federal court judgment, the binding effect of that judgment, whether applying principles of res judicata or collateral estoppel, is determined by the law of the jurisdiction that rendered it. *Gannon v. Am. Home Prods.*, 211 *N.J.* 454, 469, 48 *A.*3d 1094 (2012); *Watkins v. Resorts Int'l Hotel & Casino*, 124 *N.J.* 398, 411–12, 591 *A.*2d 592 (1991). Here, the court that rendered the judgment that the Liquidator seeks to apply is a federal court; we, therefore, look to federal law, specifically to that of the United States Court of Appeals for the Eleventh Circuit, to determine the prior judgment's preclusive effect. *Gannon, supra,* 211 *N.J.* at 471, 48 *A.*3d 1094; *Watkins, supra,* 124 *N.J.* at 411, 591 *A.*2d 592.

Collateral estoppel bars "the relitigation of an issue that has already been litigated and resolved in a prior proceeding." *Pleming v. Universal–Rundle Corp.*, 142 *F.*3d 1354, 1359 (11th Cir.1998); *accord I.A. Durbin, Inc. v. Jefferson Nat'l Bank*, 793 *F.*2d 1541, 1549 (11th Cir.1986). Collateral estoppel only applies if the party seeking to rely on the doctrine shows:

(1) [T]he issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation must have been "a critical and necessary part" of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding.

[*Pleming, supra,* 142 *F.*3d at 1359.]

Although not specifically identified as a requirement, the party against whom the doctrine is asserted must be the actual party in the prior litigation or in privity with an actual party. *See Balbirer v. Austin*, 790 *F.*2d 1524, 1526–27 n. 1 (11th Cir.1986). Although the essential elements of the federal and state tests are similar, they are not identical because New Jersey will not apply collateral estoppel if it would be unfair to do so. *Olivieri v. Y.M.F. Carpet, Inc.*, 186 *N.J.* 511, 521–22, 897 *A.*2d 1003 (2006).

The collateral estoppel elements "are the same whether a party seeks to use it 'offensively' or 'defensively.' " *In re McWhorter*, 887 *F.*2d 1564, 1567 (11th Cir.1989). "The actual

decision whether to apply collateral estoppel undoubtedly involves equitable considerations...." *Id.* at 1566. The purpose of collateral estoppel is both to "protect[ ] litigants from the burden of relitigating an identical issue with the same party" and to "promot[e] judicial economy by preventing needless litigation." *CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 *F.*3d 1309, 1317 (11th Cir.2003) (internal quotation marks omitted).

When determining whether an issue is identical to one previously litigated, the Eleventh Circuit distinguishes those issues that are identical from those that are similar. *In re McWhorter, supra,* 887 *F.*2d at 1568. Notably, the court does not apply collateral estoppel when "the transactions, although 'similar in nature and close in time,' did not involve the individual cases at issue" in the current litigation. *Ibid.* Accordingly, the issue litigated in the prior case must be "precisely the same as[ ] the case" presently before the court. *Id.* at 1567. If multiple transactions are involved, collateral estoppel cannot be utilized if the "case arises from transactions that were not at issue in the prior litigation." *Ibid.*

To decide whether an issue has been actually litigated, the Eleventh Circuit has looked to the Restatement's formulation that " '[w]hen an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated....' " *Pleming, supra,* 142 *F.*3d at 1359 (quoting *Restatement (Second) of Judgments* § 27 cmt. d (1982)). The Eleventh Circuit has also noted that the court should consider whether the burden of persuasion in the prior action was significantly heavier than the burden in the current action. *See Johnson v. Florida,* 348 *F.*3d 1334, 1347 (11th Cir.2003). Collateral estoppel also has a finality requirement, but it is "less stringent" than the finality requirement for res judicata. *Christo v. Padgett,* 223 *F.*3d 1324, 1339 (11th Cir.2000).

## V.

In this appeal, the record demonstrates Phase I of the declaratory judgment proceeding in the bankruptcy court encompassed

basic coverage issues including an interpretation of the term "occurrence" in accordance with Illinois law and the application of that interpretation to the representative cases. Phase IV of that proceeding addressed whether Celotex provided timely notice to post-October 1978 insurers. Those issues were actually litigated, and each determination was a critical and necessary part of the prior bankruptcy litigation. The record also demonstrates that the Florida Insurance Guaranty Association represented the interests of Celotex in the bankruptcy adversary action. In addition, Integrity had a full and fair opportunity to litigate the issue now before this Court, as the bankruptcy court heard evidence over more than fifty days of trial, *In re Celotex Corp., supra,* 196 *B.R.* at 977, the notice issue was resolved by summary judgment, *In re Celotex Corp., supra,* 216 *B.R.* at 870, and Celotex filed appeals in the federal district court and in the Court of Appeals for the Eleventh Circuit, *In re Celotex Corp., supra,* 299 *Fed.Appx.* at 850. Therefore, the collateral estoppel analysis focuses on the scope of the prior federal adjudication—that is, whether "the issue at stake is identical to the one involved in the prior litigation." *In re Held,* 734 *F.*2d 628, 629 (11th Cir.1984).

Resolving the issue in this case implicates the bankruptcy court's interpretation of "occurrence" because that interpretation informed the ultimate decision whether Celotex provided timely notice to its post–1978 insurers, one of which was Integrity. Although the Liquidator concedes that the claims included in the 2009 proofs of claim post-date the claims extant at the time the coverage issue was considered by the bankruptcy court, it argues, and we agree, that both sets of claims arise from the same occurrence—that is, Celotex's manufacture and distribution of asbestos-containing materials and products. Indeed, to hold otherwise ignores governing Illinois law and the fundamental predicate of the Phase IV notice order.

A. Occurrence.

As a general matter, there are three approaches to defining "occurrence": (1) the cause test; (2) the events test; and (3) the

effects test. John H. Mathias, Jr., et al., *Insurance Coverage Disputes* § 9.03 at 9–33 (Law Journal Press 2009). Under the cause test, "the number of occurrences is determined by the cause or causes of the resulting injury. . . . [T]he court asks if there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage." *Ibid.* (alterations in original) (internal quotation marks omitted). The events test is closely related to the cause test, and it "ties the number of occurrences to the number of events triggering liability on the part of the insured." *Id.* § 9.03 at 9–34 (internal quotation marks omitted). Finally, under the effects test, a court "generally find[s] a separate occurrence with respect to each injury or incident of damage." *Ibid.* (internal quotation marks omitted). As a practical matter, that test "turns a policy's per-occurrence limits into per-claim limits" because each claim is a new occurrence. *Ibid.*

Illinois is among the majority of states that have adopted the cause test. *See Nicor, Inc. v. Associated Electric & Gas Ins. Servs. Ltd.,* 223 *Ill.*2d 407, 307 *Ill.Dec.* 626, 860 *N.E.*2d 280, 287 (2006). The seminal Illinois case concerning the definition of "occurrence" in the context of asbestos-related bodily injury claims is *Zurich, supra,* 118 *Ill.*2d 23, 112 *Ill.Dec.* 684, 514 *N.E.*2d 150. In *Zurich,* the Illinois Supreme Court recognized the continuous trigger interpretation of occurrence. *See id.* 112 *Ill.Dec.* 684, 514 *N.E.*2d at 161. Under that interpretation, bodily injury during the policy period is an occurrence that triggers coverage, *id.* 112 *Ill.Dec.* 684, 514 *N.E.*2d at 159, but bodily injury occurs when a person is exposed to asbestos, when an asbestos-related injury manifests, or when a person "suffers from a disordered, weakened or unsound condition" that has not progressed as far as a diagnosable disease, *id.* 112 *Ill.Dec.* 684, 514 *N.E.*2d at 161 (internal quotation marks omitted).

The primary Illinois case concerning the definition of "occurrence" in the context of asbestos-related property damage claims is *United States Gypsum, supra,* 268 *Ill.App.*3d 598, 205 *Ill.Dec.* 619, 643 *N.E.*2d 1226. The Illinois appellate court stated "[i]t

would be unwise and without support in case law to determine that each installation of the asbestos containing products constituted a separate occurrence when Gypsum's liability is predicated on its involvement in the manufacture and sale of the products rather than the installation of the products." *Id.* 205 *Ill.Dec.* 619, 643 *N.E.*2d at 1260.

According to the *United States Gypsum* court, courts generally have "determined that 'if the continuous production and sale of an intrinsically harmful product results in similar kinds of injury or property damage, then all such injury or property damage results from a common occurrence.' " *Id.* 205 *Ill.Dec.* 619, 643 *N.E.*2d at 1259 (quoting *Dow Chem. Co. v. Associated Indem. Corp.*, 727 *F.Supp.* 1524, 1530 (E.D.Mich.1989)). More specifically, "courts have concluded that the continuing manufacture and sale of asbestos containing products constitutes a single occurrence." *Ibid.* (citing *Air Prods. & Chems. v. Hartford Accident & Indem.*, 707 *F.Supp.* 762, 773 (E.D.Pa.1989); *Stonewall Ins. Co. v. Nat'l Gypsum Co.*, 86 Civ. 9671, 1992 *WL* 123144 (S.D.N.Y. May 27, 1992); *Owens–Ill. v. Aetna Cas. & Sur. Co.*, 597 *F.Supp.* 1515, 1527 (D.D.C.1984)). Lastly, the court stated "a single occurrence is present if the insured's conduct is repetitive and results in a number of similar injuries." *Id.* 205 *Ill.Dec.* 619, 643 *N.E.*2d at 1260. Applying those principles to the case before it, the court held for the insured and found that there was a single occurrence. *See ibid.*

Here, the bankruptcy court was required to interpret the term "occurrence" in order to resolve the coverage questions presented to it. *See In re Celotex Corp., supra,* 196 *B.R.* at 1006–16. In doing so, it relied primarily on *Zurich* and *United States Gypsum. See id.* at 1008–14. The court's interpretation of the term and its application to the various insurance policies before it were consistent with the law as it existed at the time the court entered its order and as the law has developed in Illinois. *See Bd. of Educ. v. TIG Ins. Co.*, 378 *Ill.App.*3d 191, 317 *Ill.Dec.* 471, 881 *N.E.*2d 957 (2007) (affirming decision barring coverage for property damage

caused by asbestos-containing building materials based on insufficient notice of occurrence by adhering to rule of one occurrence and one notice of occurrence requirement).

### B. Notice.

The notice of loss provisions in the Integrity policies state that Celotex "shall immediately advise [Integrity] of any ... occurrence which appears likely to result in liability under this Policy *and* of subsequent developments likely to affect [Integrity's] liability hereunder." (Emphasis added). The notice of loss provisions require an initial notice of occurrence when the insured reasonably believes that the excess carriers will be impacted by the occurrence at issue. Further, the insured must then provide notice of "subsequent developments likely to affect [Integrity's] liability"— namely, notice of each subsequent claim at the time it is filed.

Under Illinois law, it is well-established that compliance with a timely notice requirement is a necessary precursor to obtaining coverage. *See, e.g., AAA Disposal Sys. v. Aetna Cas. & Sur. Co.,* 355 *Ill.App.*3d 275, 290 *Ill.Dec.* 704, 821 *N.E.*2d 1278, 1286, *appeal denied,* 213 *Ill.*2d 553, 293 *Ill.Dec.* 861, 829 *N.E.*2d 786 (2005). Timely notice of a claim is not a technicality. *Ibid.* Further, Illinois courts have interpreted insurance provisions that require notice "as soon as practicable" to mean notice "within a reasonable time." *Sears, Roebuck & Co. v. Seneca Ins. Co.,* 254 *Ill.App.*3d 686, 194 *Ill.Dec.* 57, 627 *N.E.*2d 173, 177 (1993).

 In Illinois, determining whether notice was reasonable requires an analysis of several factors, including the following: (1) timing of the notice in relationship to the status of the ongoing claims or the ongoing litigation; (2) the sophistication of the insured; (3) the insured's diligence; and (4) prejudice. *Highlands Ins. Co. v. Lewis Rail Serv. Co.,* 10 *F.*3d 1247, 1250 (7th Cir.1993). Contrary to the law in most jurisdictions, Illinois holds prejudice is simply a relevant factor in considering whether notice was reasonable. *Country Mut. Ins. Co. v. Livorsi Marine, Inc.,* 222 *Ill.*2d 303, 305 *Ill.Dec.* 533, 856 *N.E.*2d 338, 346 (2006).

 In the context of an excess insurance policy, "courts consider that the excess insurer's obligation to provide coverage is only triggered once the primary insurance has been exhausted...." *Zurich Ins. Co. v. Walsh Constr. Co. of Ill., Inc.*, 352 *Ill.App.*3d 504, 287 *Ill.Dec.* 834, 816 *N.E.*2d 801, 806 (2004). As a result, "the language of the excess policy generally requires notice of an occurrence or suit 'when it appears likely' that the excess policy will be implicated." *Ibid.*

 Consistent with Illinois law, the bankruptcy judge held that when an insured continuously produces and sells a harmful product, such as asbestos-containing materials or products that result in similar kinds of injury or property damages, any resulting injury or property damages derives from a common occurrence. *In re Celotex Corp., supra,* 196 *B.R.* at 1016. Moreover, the bankruptcy court concluded that, given the magnitude of bodily injury asbestos claims and the rising tide of asbestos-related property damage claims, Celotex should have known that its primary coverage would be exhausted and its excess insurance would be accessed. *In re Celotex Corp., supra,* 216 *B.R.* at 879–80. Indeed, between 1982–1984, Celotex had no primary comprehensive general liability coverage for asbestos-related claims. *Id.* at 871, 874. The bankruptcy court also found that Celotex failed to inform Integrity of that development. *Id.* at 876. In accordance with Illinois law, Celotex was obliged to provide notice of occurrence when it reasonably believed the excess coverage would be accessed, and it did not do so. *See id.* at 880. Further, under Illinois law, compliance with a timely notice requirement is a necessary precursor to obtaining coverage; it is not merely a technicality. *AAA Disposal Sys., supra,* 290 *Ill.Dec.* 704, 821 *N.E.*2d at 1286.

The Trust contends, however, that the notice provision of the Integrity policies also contains a notice of claims requirement. It argues that the prior bankruptcy proceeding addressed only whether Celotex had provided notice of pending claims. That being the case, the prior adjudication never addressed future

unknown or unmanifested claims. That argument, however, ignores the very issues raised and expressly adjudicated in Phase I of the prior bankruptcy proceeding and the decision of the court of appeals. It ignores the clear distinction under Illinois law between an occurrence and a claim. The Trust's argument also ignores the direct relationship between the proper interpretation of occurrence and the obligation to provide timely notice of an occurrence. Furthermore, in concluding that Celotex was barred from obtaining coverage, the bankruptcy court stated "[t]he evidence establishes [that Celotex] did not give *notice of occurrence* regarding asbestos bodily injury claims ... until 1983 at the earliest." *In re Celotex Corp., supra,* 216 *B.R.* at 882 (emphasis added). In addition, the circuit court referred to "all future asbestos litigation," which is indicative of a broader reach than existing claims. *See In re Celotex Corp., supra,* 299 *Fed.Appx.* at 856.

The Trust also contends its 2009 claims implicate a different activity than the activities at issue in the bankruptcy proceeding. It notes that its current set of claims include installation by Celotex of asbestos-containing materials as distinguished from the installation of its asbestos-containing materials by others. *Nicor* indicates the occurrence analysis in *United States Gypsum* might change if the insured's liability is based on its installation of the materials. 307 *Ill.Dec.* 626, 860 *N.E.*2d at 298–99. In that case, its installation of materials would be a separate occurrence. *Ibid.* The record in this case, however, supports only inclusion of asbestos in products manufactured and sold by Celotex that were then installed in buildings by others. As such, this case and *United States Gypsum* are materially indistinguishable.

We conclude that the Florida decisions determined that Celotex was barred from obtaining coverage because it failed to provide proper notice of occurrence. The Eleventh Circuit first noted that the policies required written notice " 'as soon as practicable' in the event of an 'occurrence' 'reasonably likely' to implicate coverage" *and* written notice of " 'any claim made on account of such

occurrence.'" *In re Celotex Corp., supra,* 299 *Fed.Appx.* at 852. Importantly, the Eleventh Circuit analyzed the issue before it with a focus on the entire scope of the asbestos litigation. That focus is critical given the nature of asbestos-related injury, whether bodily injury or property damage, as it may take years for injury or damage to manifest. The circuit court stated "[a]n insured who has reason to believe excess carriers will be impacted *in the future* must give notice when it reaches that understanding...." *Id.* at 855 (emphasis added). Similarly, the court stated that, because "Celotex foresaw ... that its excess insurers would be impacted by the *overall course* of the property-damage litigation[,]" notice was due at that time. *Id.* at 856 (emphasis added). We conclude that the Florida courts were focused on the asbestos litigation as a whole and not on specific claims then pending. Furthermore, both the policies' plain language and Illinois case law indicate that there is one occurrence from which all of the claims against Celotex derive.

## VI.

All of the claims brought against Celotex pertain to either bodily injury or property damage resulting from exposure to Celotex's asbestos-containing building materials. The very nature of the claims in which the manifestation of injury to a person or to a property owner may be delayed for years underscores the purpose of timely notice of occurrence. Here, even at the time Celotex obtained the first of the two Integrity excess policies, it knew that it would face many more individual claims for asbestos-related bodily injury and asbestos-related property damage due to its decision to incorporate asbestos in its products, its manufacture and distribution of those products, and the delay in manifestation of injury to person or to property. In the context of the duty to provide notice of an occurrence, the focus was on the entirety of the claims spawned by its inclusion of asbestos in its products and the likelihood that it would exhaust lower layers of insurance coverage. Under the plain and ordinary meaning of the Integrity

policies, all of the claims result from a singular occurrence. We, therefore, determine that the orders entered in the prior bankruptcy proceeding bar the 2009 proofs of claim filed by the Trust because of the doctrine of collateral estoppel.

## VII.

The judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice RABNER and Justices HOENS, PATTERSON, RODRÍGUEZ (t/a), and CUFF (t/a)—5.